07 C 7286

JUDGE GETTLEMAN
MAGISTRATE JUDGE NOLAN

**EXHIBIT D**

#348

College PARk, MD

# JIMMY JOHN'S FRANCHISE, INC.

## FRANCHISE AGREEMENT

## THIS CONTRACT IS SUBJECT TO ARBITRATION

## TABLE OF CONTENTS

PARAGRAPH                                                                    PAGE

I.      APPOINTMENT AND FRANCHISE FEE ................................................2

II.     TERM AND RENEWAL ..................................................................3

III.    RESTAURANT LOCATION..............................................................5

IV.     TRAINING AND ASSISTANCE ........................................................7

V.      PROPRIETARY MARKS .................................................................9

VI.     CONFIDENTIAL OPERATIONS MANUAL.........................................11

VII.    CONFIDENTIAL INFORMATION .....................................................11

VIII.   MODIFICATION OF THE SYSTEM....................................................12

IX.     ADVERTISING.............................................................................13

X.      CONTINUING SERVICES AND ROYALTY FEE...................................15

XI.     ACCOUNTING AND RECORDS........................................................17

XII.    STANDARDS OF QUALITY AND PERFORMANCE ..............................18

XIII.   FRANCHISOR'S OPERATIONS ASSISTANCE.....................................23

XIV.    INSURANCE................................................................................24

XV.     COVENANTS ..............................................................................26

XVI.    DEFAULT AND TERMINATION.......................................................28

XVII.   RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION
        OR TERMINATION ......................................................................30

XVIII.  TRANSFERABILITY OF INTEREST .................................................32

XIX.    DEATH OR INCAPACITY OF FRANCHISEE ......................................38

XX.     RIGHT OF FIRST REFUSAL...........................................................39

XXI.    OPERATION IN THE EVENT OF ABSENCE, DISABILITY OR DEATH............40

**PARAGRAPH**                                                                     **PAGE**

XXII.     INDEPENDENT CONTRACTOR AND INDEMNIFICATION ............................40

XXIII.    NON-WAIVER............................................................................................41

XXIV.    NOTICES....................................................................................................41

XXV.     COST OF ENFORCEMENT OR DEFENSE................................................42

XXVI.    APPROVALS ...............................................................................................42

XXVII.   ENTIRE AGREEMENT ...............................................................................42

XXVIII.  SEVERABILITY AND CONSTRUCTION ..................................................43

XXIX.    APPLICABLE LAW .....................................................................................43

XXX.     ARBITRATION ............................................................................................44

XXXI.    FORCE MAJEURE .......................................................................................45

XXXII.   "FRANCHISEE" DEFINED AND GUARANTY ..........................................45

XXXIII.  CAVEAT ......................................................................................................46

XXXIV.  ACKNOWLEDGMENTS .............................................................................46

<u>EXHIBITS</u>

A.   GUARANTY AND ASSUMPTION OF OBLIGATIONS
B.   REFUNDS AND CANCELLATION
C.   CONVERSION FRANCHISE AGREEMENT/MINI-MART FRANCHISE
     AGREEMENT

## JIMMY JOHN'S FRANCHISE, INC.
## FRANCHISE AGREEMENT

This Franchise Agreement ("Agreement") is made this _22nd_ day of _April_ _2002_, by and between JIMMY JOHN'S FRANCHISE, INC., an Illinois corporation, having its principal place of business at 600 Tollgate Road, Elgin, Illinois 60123 ("Franchisor"), and _DELI FRESH INC._                    _THM_        ("Franchisee").

## WITNESSETH:

WHEREAS, Franchisor and its affiliates, over a period of time and as the result of the expenditure of time, expertise, effort and money, (i) have developed and own a distinctive system ("System"), identified by the mark "JIMMY JOHN'S", relating to the establishment, development and operation of a restaurant facility providing carry-out and delivery services and (at certain locations) on premises dining services, and featuring gourmet deli sandwiches, fresh baked breads, salads, and other food and beverage products, all prepared in accordance with specified recipes and procedures and using high quality ingredients ("Menu Items"); (ii) have developed and continue to further develop a proprietary line of specially formulated bread dough and other food products ("Trade Secret Food Products"); (iii) have developed certain presentation, packaging and marketing standards and techniques for all Menu Items and Trade Secret Food Products; and (iv) have developed consumer acceptance for all Menu Items and Trade Secret Food Products ("Franchised Restaurant"); and

WHEREAS, the distinguishing characteristics of the System include, without limitation, distinctive exterior and interior layout, design and color scheme; exclusively designed signage, decorations, furnishings and materials; special recipes, formulae, menus and food and beverage designations; the JIMMY JOHN'S Confidential Operations Manual ("Manual"); food and beverage storage, preparation, service and delivery procedures and techniques; operating procedures for sanitation and maintenance; and methods and techniques for inventory and cost controls, record keeping and reporting, personnel management, purchasing, sales promotion and advertising; all of which may be changed, improved and further developed by Franchisor from time to time; and

WHEREAS, Jimmy John's Enterprises, Inc. formerly known as Jimmy John's, Inc. of Urbana is the owner of the right, title and interest together with all the goodwill connected thereto in and to the trade names, service marks and trademarks "JIMMY JOHN'S", "JIMMY JOHN'S, plus the design", associated logos and commercial symbols, and such other trade names, service marks, and trademarks as are now designated (and may hereinafter be designated by Franchisor in writing) as part of the System ("Mark[s]"), and has licensed the rights in the Marks to Franchisor with the right to sublicense to Franchisor's franchisees. Franchisor will continue to develop, use and control such Marks for the benefit and use of itself and its franchisees in order to identify for the public the source of food products and services marketed thereunder and to represent the System's high standards of quality regarding Menu Items, operations, food products, ingredients, appearance and service; and

**WHEREAS**, Franchisor grants to qualified persons franchises to own and operate JIMMY JOHN'S restaurants offering food products and services authorized and approved by Franchisor and utilizing the System and Marks. Franchisee desires to operate a JIMMY JOHN'S Restaurant using the System and Marks and has applied for a franchise, which application has been approved by Franchisor in reliance upon all of the representations made therein; and

**WHEREAS**, Franchisee understands and acknowledges the importance of Franchisor's high and uniform standards of quality, operations and customer service and the necessity of operating the JIMMY JOHN'S Restaurant in conformity with Franchisor's standards and specifications; and

**WHEREAS**, Franchisor expressly disclaims the making of and Franchisee acknowledges that it has not received nor relied upon any warranty or guaranty, express or implied, as to the revenues, profits, or success of the business venture contemplated by this Agreement. Franchisee acknowledges that it has read this Agreement and Franchisor's Uniform Franchise Offering Circular and that it has no knowledge of any representations by Franchisor, or its officers, directors, shareholders, employees or agents that are contrary to the statements made in Franchisor's Uniform Franchise Offering Circular or to the terms herein.

**NOW, THEREFORE**, the parties, in consideration of the undertakings and commitments of each party to the other set forth in this Agreement, hereby agree as follows:

## I. APPOINTMENT AND FRANCHISE FEE

A.    Franchisor hereby grants to Franchisee, upon the terms and conditions herein contained, the right, license and privilege to use the Mark "JIMMY JOHN'S" and the other Marks, and Franchisee undertakes the obligation to operate a JIMMY JOHN'S restaurant facility featuring the Menu Items and offering carry-out and delivery services and (at certain locations) on-premises dining services and to use solely in connection therewith the System, as it is currently established, and as it may be changed, improved and further developed from time to time, at one (1) location only, such location to be: *JK*

1.    Washington, DC _____

("Premises"); or

2.    At a location to be designated, as provided in Paragraph III hereof, within the following area:_____ provided, however, that when a location has been designated and approved by the parties, said location shall become Paragraph I.A.1. as if originally incorporated therein. Franchisee shall not relocate its Franchised Restaurant without the prior written approval of Franchisor.

B. ~~Franchisor does not grant territorial protection~~ in conjunction with this franchise. Franchisor may operate and grant franchises for other JIMMY JOHN'S Restaurants at any locations it desires ~~other than the location designated~~ in Paragraph I.A.1 above and may establish under the Marks anywhere it wants other businesses that are owned by other franchisees or by Franchisor or its affiliates, or other distribution channels, that compete with Franchisee's Franchised Restaurant.

C. Franchisor reserves the right to offer and sell at wholesale, retail, or through any other distribution system, including at other JIMMY JOHN'S Restaurants (wherever located) and through the Internet and other channels, the Trade Secret Food Products and products and services which comprise or may in the future comprise a part of the System, which products also may be resold at retail or through any other distribution channel to the general public. Franchisor further reserves the right to sell at both wholesale and retail all products and services, which do not comprise a part of the System. Franchisor also reserves the right to establish food service units operating under a format and trademarks and service marks distinct from the JIMMY JOHN'S System.

D. In consideration of the franchise granted herein, Franchisee shall pay to Franchisor upon execution of this Agreement an initial franchise fee equal to _____ Twenty-Five Thousand_____ DOLLARS ( $ 25,000 ). Said fee shall be deemed earned and non-refundable upon execution of this Agreement as consideration for expenses incurred by Franchisor in furnishing assistance and services to Franchisee and for Franchisor's lost or deferred opportunity to franchise others, except as may be otherwise specifically provided in this Agreement and/or any exhibit attached hereto.

E. Franchisee acknowledges that, because complete and detailed uniformity under many varying conditions may not be possible or practical, Franchisor specifically reserves the right and privilege, as it may deem in the best interests of all concerned in any specific instance, to vary standards for any System franchisee based upon the peculiarities of the particular site or circumstance, density of population, business potential, population of trade area, existing business practices or any other condition which Franchisor deems to be of importance to the successful operation of such franchisee's business. Franchisee shall not be entitled to require Franchisor to grant to Franchisee a like or similar variation hereunder.

## II.   TERM AND RENEWAL

A. This Agreement shall be effective and binding from the date of its execution for an initial term equal to the lesser of the initial term of the lease for the Franchised Premises or ten (10) years commencing on the date of this Agreement.

B. Franchisee shall have the right to renew this franchise for two (2) additional successive terms of five (5) years each, providing all of the conditions hereinafter set forth have been fulfilled:

1.     Franchisee has, during the entire term of this Agreement (or, as applicable, the term of the franchise agreement for the first five (5) year renewal term), complied with all its provisions;

2.     At the time of giving notice of renewal to Franchisor, Franchisee is not in default under any terms of this Agreement (or, as applicable, the term of the franchise agreement for the first five (5) year renewal term), nor has Franchisee at any time during the term of this Agreement (or, as applicable, the term of the franchise agreement for the first five (5) year renewal term) been in material default under any provisions of this Agreement (or that agreement);

3.     Franchisee maintains possession of the Franchised Restaurant and, before the expiration date of this Agreement (or, as applicable, the term of the franchise agreement for the first five (5) year renewal term), has brought the Franchised Restaurant into full compliance with the specifications and standards then applicable for new or renewing JIMMY JOHN'S Restaurants and presents evidence satisfactory to Franchisor that it has the right to remain in possession of the Franchised Restaurant Premises for the duration of any renewal term; or, in the event Franchisee is unable to maintain possession of the Premises of the Franchised Restaurant, or if, in the judgment of Franchisor, the Franchised Restaurant should be relocated, Franchisee secures substitute Premises approved by Franchisor and has finished, stocked and equipped such Premises to bring the Franchised Restaurant at its substituted Premises into full compliance with the then-current specifications and standards before the expiration date of this Agreement (or, as applicable, the term of the franchise agreement for the first five (5) year renewal term);

4.     Franchisee has given notice of renewal to Franchisor as provided hereinafter;

5.     Franchisee has satisfied all monetary obligations owed by Franchisee to Franchisor and has timely met these obligations throughout the term of this Agreement (or, as applicable, the term of the franchise agreement for the first five (5) year renewal term);

6.     Franchisee has executed upon renewal Franchisor's then-current form of franchise agreement (with appropriate modifications to reflect the fact that the agreement relates to the grant of a renewal franchise), which agreement shall supersede in all respects this Agreement, and the terms of which may differ from the terms of this Agreement, including, without limitation, a different percentage Continuing Services and Royalty Fee and advertising contribution; provided, however, Franchisee shall not be required to pay the then-current initial franchise fee or its equivalent;

7.     Franchisee has complied with Franchisor's then-current qualifications and training requirements; and

8.    Franchisee has executed a general release, in a form prescribed by Franchisor, of any and all claims against Franchisor and its respective officers, directors, agents, shareholders and employees.

C.    If Franchisee desires to renew this franchise before the expiration of this Agreement, Franchisee shall give Franchisor written notice of its desire to renew at least six (6) months, but not more than twelve (12) months, prior to the expiration of the initial term of this Agreement. Within sixty (60) days after its receipt of such timely notice, Franchisor shall furnish Franchisee with written notice of: (i) reasons which could cause Franchisor not to grant a renewal to Franchisee, including, but not limited to, any deficiencies which require correction and a schedule for correction thereof by Franchisee; and (ii) Franchisor's then-current requirements relating to the image, appearance, decoration, furnishing, equipping and stocking of JIMMY JOHN'S Restaurants and a schedule for effecting upgrading or modifications in order to bring the Franchised Restaurant in compliance therewith as a condition of renewal. Renewal of the franchise shall be conditioned upon Franchisee's compliance with such requirements and continued compliance with all the terms and conditions of this Agreement up to the date of termination of the initial term. Franchisee's renewal of the lease or sublease for the premises of the Franchised Restaurant, or execution of a new lease or sublease for such premises, shall be deemed Franchisee's election to renew the franchise for the term of such lease or sublease, whether or not Franchisee otherwise notifies Franchisor of its desire to renew the franchise, although Franchisor shall continue to have all of the rights described in this Paragraph II and may require that Franchisee satisfy all of these conditions before a renewal of the franchise takes effect.

D.    Franchisor shall give Franchisee written notice of its election not to renew the franchise at least three (3) months prior to the expiration of the initial term of this Agreement unless, because of Franchisee's failure to provide timely notice to Franchisor, Franchisor does not notify Franchisee of Franchisor's election not to renew the franchise until sometime during the three (3) month period prior to its expiration.

## III.    RESTAURANT LOCATION

A.    Franchisee shall operate the Franchised Restaurant only at the location specified in Paragraph I hereof. If the lease for the site of the Franchised Restaurant expires or terminates without fault of Franchisee, or if the site is destroyed, condemned or otherwise rendered unusable, or as otherwise may be agreed upon in writing by Franchisor and Franchisee, Franchisor will grant permission for relocation of the Franchised Restaurant at a location and site acceptable to Franchisor. Any such relocation shall be at Franchisee's sole expense, and Franchisor shall have the right to charge Franchisee for any and all reasonable costs incurred by Franchisor and a reasonable fee, as set forth in the Manual, for its services in connection with any such relocation of the Franchised Restaurant.

B.    Franchisee shall be responsible for purchasing or leasing a suitable site for the Franchised Restaurant. Prior to the acquisition by lease or purchase of any site for the Premises of the Franchised Restaurant, Franchisee shall submit a description of the proposed site to

Franchisor, together with a letter of intent or other evidence satisfactory to Franchisor, which confirms Franchisee's favorable prospects for obtaining the proposed site. Franchisor shall provide Franchisee written notice of approval or disapproval of the proposed site within thirty (30) business days after receiving Franchisee's written proposal.

C.    After receiving Franchisor's written approval of the location of the Franchised Restaurant as provided in Paragraph III.B. hereof, Franchisee shall, subject to the prior approval of terms by Franchisor, execute a lease (if the Premises are to be leased) or a binding agreement to purchase the site. Franchisor's approval of the lease shall be conditioned upon inclusion in the lease of terms acceptable to Franchisor. At Franchisor's option, the lease shall contain such provisions, including, but not limited to:

1.    A provision reserving to Franchisor the right, at Franchisor's election, to receive an assignment of the leasehold interest upon termination or expiration of the franchise grant;

2.    A provision which expressly requires the lessor to provide Franchisor all sales and other information lessor may have related to the operation of the Franchised Restaurant, as Franchisor may request;

3.    A provision which requires the lessor concurrently to provide Franchisor with a copy of any written notice of deficiency under the lease sent to Franchisee and which grants to Franchisor, in its sole discretion, the right (but not the obligation) to cure any deficiency under the lease within fifteen (15) business days after the expiration of the period which Franchisee had to cure any such default should Franchisee fail to do so;

4.    A provision which evidences the right of Franchisee to display the Marks in accordance with the specifications required by the Manual, subject only to the provisions of applicable law;

5.    A provision that the Premises be used for the operation of a Franchised Restaurant; and

6.    A provision which expressly states that any default under the lease shall constitute a default under this Agreement.

D.    If the location is not designated above, Franchisor shall use reasonable efforts to help analyze Franchisee's market area, to help determine site feasibility, and to assist in designating the location, which must be approved by Franchisor; provided however, that Franchisor will not conduct site selection activities on Franchisee's behalf. While Franchisor shall utilize its experience and expertise in designating the location, nothing contained herein shall be interpreted as a guarantee of success for said location, nor shall any site recommendation or approval made by Franchisor be deemed a representation that any particular site is available for use as a JIMMY JOHN'S restaurant. It shall be the sole responsibility of Franchisee to

undertake site selection activities and otherwise secure Premises for Franchisee's Franchised Restaurant.

E.    In the event no acceptable site is found and approved by the parties within ninety (90) days from the date of this Agreement, then, upon written application from either party, this contract shall be terminated and, except as provided below, the initial franchise fee received by Franchisor shall be returned to Franchisee. Provided, however, that in the event Franchisor has within the aforesaid time submitted in writing to Franchisee two (2) or more sites which are acceptable to Franchisor, and Franchisee has refused to accept same, then Franchisee, upon termination, shall forfeit to Franchisor one-half (½) of the initial franchise fee paid to Franchisor in payment for Franchisor's expenses in its site evaluation and selection activities. Franchisee and Franchisor agree that one-half (½) of the initial franchise fee paid to Franchisor is a reasonable amount for Franchisor to keep under the circumstances and that, due to the nature of the subject matter, it will be impossible to ascertain the exact amount of damages sustained by the recipient therefore.

F.    Franchisee shall promptly after obtaining possession of the site for the Franchised Restaurant: (i) cause to be prepared and submit for approval by Franchisor a site survey and architectural plans in accordance with Franchisor's specifications for the development of a JIMMY JOHN'S Restaurant (including requirements for dimensions, exterior design, materials, interior design and layout, equipment, fixtures, furniture, signs and decorating) at the site leased or purchased therefor, provided that Franchisee may modify Franchisor's specifications only to the extent required to comply with all applicable ordinances, building codes and permit requirements and only with prior notification to and approval by Franchisor; (ii) obtain all required zoning changes, building, utility, health, sanitation and sign permits and licenses and any other required permits and licenses; (iii) purchase or lease equipment, fixtures, furniture and signs as provided herein; (iv) complete the construction and/or remodeling, equipment, fixtures, furniture and sign installation and decorating of the Franchised Restaurant in full and strict compliance with plans and specifications therefor approved by Franchisor and all applicable ordinances, building codes and permit requirements; (v) obtain all customary contractors' sworn statements and partial and final waivers of lien for construction, remodeling, decorating and installation services; and (vi) otherwise complete development of and have the Franchised Restaurant ready to open and commence the conduct of its business in accordance with Paragraph XII hereof.

## IV.    TRAINING AND ASSISTANCE

A.    Prior to Franchisee's commencement of operations, Franchisor provides an initial training program available to Franchisee, if an owner/operator, and, at Franchisee's discretion, up to one (1) of Franchisee's designates. If Franchisee is an investor and not an owner/operator, the initial program shall be available to Franchisee and, at Franchisee's discretion, up to one (1) of Franchisee's designates. If Franchisee chooses not to attend said training, Franchisee must send a General Manager and an Assistant Manager.  The initial training program shall be three (3) weeks in duration at Franchisor's discretion. If the General Manager and Assistant Manager attend training, both must successfully complete said program. Otherwise, Franchisee is required

to attend and successfully complete said program. The initial training program will be conducted at Franchisor's headquarters, a JIMMY JOHN'S restaurant or at such other place as Franchisor shall designate. Said training program shall include classroom training and on-the-job training at a JIMMY JOHN'S Restaurant and shall cover material aspects of the operation of a JIMMY JOHN'S Restaurant, including financial controls, general bookkeeping procedures, food preparation, service and operational techniques, familiarization with recipes and cooking procedures, marketing and advertising techniques, sanitation and maintenance procedures, deployment of labor, maintenance of quality standards, and an understanding of the Manual. Following completion of the training program, the attendee will be required to pass an operations proficiency exam which will entitle them to a management certification. At least one (1) manager at the Franchised Restaurant must have passed the franchise operations proficiency examination (and received a Certificate of Training from Franchisor) and have a state health certificate to maintain the franchise in good standing. Failure to comply with this requirement is a default under this Agreement. If Franchisee or its key employee fails to successfully complete the initial training program, Franchisor may require Franchisee to designate another key employee to attend and successfully complete the initial training program at Franchisee's expense. All expenses incurred by Franchisee and its employees in attending such program, including, without limitation, travel costs, room and board expenses, and employee's salaries shall be the sole responsibility of Franchisee.

If Franchisee already owns and operates one or more other JIMMY JOHN'S restaurants when it signs this Agreement, then Franchisee's employee may, as provided in this paragraph, participate in a five (5) day training program for the Franchised Restaurant covered by this Agreement rather than Franchisor's standard three (3) week training program. Franchisee may send its employee to this abbreviated or refresher training only if that employee has been a full-time employee or manager at another JIMMY JOHN'S restaurant for at least sixty (60) days, that other JIMMY JOHN'S restaurant is in full compliance with all of Franchisor's standards, specifications, and operating procedures, and the employee attending the five (5) days of training will manage the Franchised Restaurant covered by this Agreement or the restaurant at which he or she has been working (allowing the General Manager or Assistant Manager of the other restaurant to hold that position at the Franchised Restaurant covered by this Agreement). The five (5) days of training will be conducted at Franchisor's headquarters, a JIMMY JOHN'S restaurant, or at such other place as Franchisor shall designate. If Franchisee wants the five (5) days of training to occur at the Franchised Restaurant, then Franchisee must pay Franchisor's current per diem charge for training plus all of Franchisor's expenses. If these conditions are not satisfied, then Franchisee and its employees must attend Franchisor's standard three (3) week training program.

B.    Around the commencement of operations of Franchisee's Franchised Restaurant, Franchisor will furnish to Franchisee, at Franchisee's Premises and at Franchisor's expense, one of Franchisor's representatives for the purpose of facilitating the opening of Franchisee's Franchised Restaurant. Franchisee will receive twenty-four (24) hours of said representative's time for the first Franchised Restaurant; sixteen (16) hours of said representative's time for Franchisee's second (2nd) Franchised Restaurant; and eight (8) hours of said representative's time for the third (3rd) and each subsequent Franchised Restaurant that Franchisee opens.

Franchisee is required to successfully complete this phase of the initial training program as well. During this period, such representative will also assist Franchisee in establishing and standardizing procedures and techniques essential to the operation of a JIMMY JOHN'S Restaurant and shall assist in training personnel. Should Franchisee request additional assistance from Franchisor in order to facilitate the opening of the Franchised Restaurant, and should Franchisor deem it necessary, feasible and appropriate to comply with the request, Franchisee shall reimburse Franchisor for the expense of Franchisor providing such additional assistance, which may include Franchisor's then-current service fee, as set forth in the Manual, which may be amended from time to time.

C.    If Franchisee is unable to satisfactorily complete the training program, Franchisor shall have the right to terminate this Agreement. If this Agreement is terminated pursuant to this Paragraph, Franchisor shall be entitled to retain one-half (1/2) of the initial franchise fee paid to Franchisor in payment for the expenses incurred by Franchisor as of such date for providing training to Franchisee and other expenses incurred by Franchisor. Upon return to Franchisee of the other one-half (1/2) of the initial franchise fee previously paid to Franchisor, Franchisor shall be fully and forever released from any claims or causes of action Franchisee may have under or pursuant to this Agreement.

D.    Franchisor from time to time may provide and, if it does, may require that previously-trained and experienced franchisees, their managers and/or employees attend and successfully complete refresher training programs or seminars to be conducted at such location as may be designated by Franchisor. Attendance at such refresher training programs or seminars shall be at Franchisee's sole expense, provided, however, that attendance will not be required at more than two (2) such programs in any calendar year and shall not collectively exceed ten (10) business days in duration during any calendar year.

E.    If Franchisee designates new or additional managers after the initial training program, Franchisor shall provide training to such managers at the then-current published rates. Any and all designated managers shall be required to successfully complete the training program provided at Franchisor's headquarters or such other location designated by Franchisor. Franchisee shall bear all costs incurred by Franchisee's employees attending such training program.

V.    **PROPRIETARY MARKS**

A.    Franchisee acknowledges that Jimmy John's Enterprises, Inc. formerly known as Jimmy John's, Inc. of Urbana is the owner of all right, title and interest together with all the goodwill of the Marks. Franchisee further acknowledges that Franchisee's right to use the Marks is derived solely from this Agreement and is limited to the conduct of business by Franchisee pursuant to and in compliance with this Agreement and all applicable standards, specifications, and operating procedures prescribed by Franchisor from time to time during the term of the Franchise. Any unauthorized use of the Marks by Franchisee is a breach of this Agreement and an infringement of the rights of Franchisor in and to the Marks. Franchisee acknowledges that all usage of the Marks by Franchisee and any goodwill established by Franchisee's use of the Marks

shall inure to the exclusive benefit of Franchisor and that this Agreement does not confer any goodwill or other interests in the Marks upon Franchisee. Franchisee shall not, at any time during the term of this Agreement or after its termination or expiration, contest the validity or ownership of any of the Marks or assist any other person in contesting the validity or ownership of the Marks. All provisions of this Agreement applicable to the Marks apply to any and all additional trademarks, service marks, and commercial symbols authorized for use by and licensed to Franchisee by Franchisor after the date of this Agreement.

B.    Franchisee shall not use any Mark or portion of any Mark as part of a corporate or trade name, or with any prefix, suffix, or other modifying words, terms, designs, or symbols, or in any modified form. Franchisee shall not use any Mark in connection with the sale of any unauthorized product or service or in any other manner not expressly authorized in writing by Franchisor. Franchisee shall give such notices of trademark and service mark registrations as Franchisor specifies and obtain such fictitious or assumed name registrations as may be required under applicable law.

C.    Franchisee shall promptly notify Franchisor of any claim, demand or cause of action based upon or arising from any attempt by any other person, firm or corporation to use the Marks or any colorable imitation thereof. Franchisee shall also notify Franchisor of any action, claim or demand against Franchisee relating to the Marks within ten (10) days after Franchisee receives notice of said action, claim or demand. Upon receipt of timely notice of an action, claim or demand against Franchisee relating to the Marks, Franchisor shall have the sole right, but not the duty, to defend any such action. Franchisor shall have the exclusive right to contest or bring action against any third party regarding the third party's use of any of the Marks. In any defense or prosecution of any litigation relating to the Marks or components of the System undertaken by Franchisor, Franchisee shall cooperate with Franchisor and execute any and all documents and take all actions as may be desirable or necessary in the opinion of counsel to carry out such defense or prosecution. Both parties shall make every effort consistent with the foregoing to protect, maintain, and promote the Marks as identifying the System and only the System.

D.    If it becomes advisable at any time for Franchisor to modify or discontinue use of any Mark, and/or use one or more additional or substitute trade names, trademarks, service marks, or other commercial symbols, Franchisee shall comply with Franchisor's directions within a reasonable time after notice to Franchisee by Franchisor. Franchisor shall have no liability or obligation whatsoever with respect to Franchisee's modification or discontinuance of any Mark or use of any additional or substitute trademarks.

E.    In order to preserve the validity and integrity of the Marks and copyrighted material licensed herein and to ensure that Franchisee is properly employing the same in the operation of its Franchised Restaurant, Franchisor or its agents shall have the right of entry and inspection of Franchisee's Premises and operating procedures at all reasonable times. Franchisor shall have the right to observe the manner in which Franchisee is rendering its JIMMY JOHN'S Restaurant services and conducting its operations, to confer with Franchisee's employees and customers, and to select Menu Items, the Trade Secret Food Products, ingredients, food and non-food products, beverages, and other items, products and supplies for test of content and

evaluation purposes to make certain that the Menu Items, the Trade Secret Food Products, ingredients, food and nonfood products, beverages and other items, products, materials and supplies are satisfactory and meet the quality control provisions and performance standards established by Franchisor.

F.     Franchisee shall not establish a Web site on the Internet using any domain name containing the words "JIMMY JOHN'S" or any variation thereof. Franchisor retains the sole right to advertise on the Internet and create a Web site using the "JIMMY JOHN'S domain name. Franchisee acknowledges that Franchisor is the owner of all right, title and interest in and to such domain names as Franchisor shall designate in the Manual. Franchisor retains the right to pre-approve Franchisee's use of linking and framing between Franchisee's Web pages and all other Web sites. If requested by Franchisor, Franchisee shall, within five (5) days, dismantle any frames and links between Franchisee's Web pages and any other Web sites.

## VI.     CONFIDENTIAL OPERATIONS MANUAL

A.     Franchisor will loan to Franchisee during the term of the franchise one (1) copy of a Manual containing reasonable, mandatory and suggested specifications, standards, operating procedures and rules prescribed from time to time by Franchisor for JIMMY JOHN'S Restaurants and information relative to other obligations of Franchisee hereunder. Franchisor shall have the right to add to and otherwise modify the Manual from time to time to reflect changes in the specifications, standards, operating procedures and rules prescribed by Franchisor for JIMMY JOHN'S Restaurants.

B.     The Manual shall at all times remain the sole property of Franchisor and shall promptly be returned upon the expiration or other termination of this Agreement.

C.     The Manual contains proprietary information of Franchisor and shall be kept confidential by Franchisee both during the term of the franchise and subsequent to the expiration and/or termination of the franchise. Franchisee shall at all times insure that its copy of the Manual be available at the Franchised Restaurant Premises in a current and up-to-date manner. At all times that the Manual is not in use by authorized personnel, Franchisee shall maintain the Manual in a locked receptacle at the Premises of the Franchised Restaurant and shall only grant authorized personnel, as defined in the Manual, access to the key or lock combination of such receptacle. In the event of any dispute as to the contents of the Manual, the terms of the master copy of the Manual maintained by Franchisor at Franchisor's home office shall be controlling.

## VII.     CONFIDENTIAL INFORMATION

A.     Franchisee acknowledges that its entire knowledge of the operation of a JIMMY JOHN'S Restaurant, including, without limitation, the method of preparation of Menu Items, Trade Secret Food Products and other food products, and other specifications, product formulae, standards and operating procedures of a JIMMY JOHN'S Restaurant, is derived from information disclosed to Franchisee by Franchisor and that such information is proprietary, confidential and the trade secret of Franchisor. In addition, any improvements developed by

Franchisee pursuant to Franchisee's operation of the Franchised Restaurant shall constitute proprietary information of Franchisor. "Trade Secrets" refer to the whole or any portion of know-how, knowledge, methods, recipes, formulae, specifications, processes, procedures and/or improvements regarding the JIMMY JOHN'S Restaurant and the System that is valuable and secret in the sense that it is not generally known to competitors of Franchisor. Franchisee shall maintain the absolute confidentiality of all such information during and after the term of the franchise and shall not use any such information in any other business or in any manner not specifically authorized or approved in writing by Franchisor.

B.    Franchisee shall divulge such confidential information only to the extent and only to such of its employees as must have access to it in order to operate the Franchised Restaurant. Any and all information, knowledge and know-how, including, without limitation, drawings, materials, equipment, techniques, restaurant systems, product formulae, recipes and other data, which Franchisor designates as confidential shall be deemed confidential for purposes of this Agreement, except information which Franchisee can demonstrate lawfully came to its attention prior to disclosure thereof by Franchisor; or which, at the time of disclosure by Franchisor to Franchisee, had lawfully become a part of the public domain through publication or communication by others; or which, after disclosure to Franchisee by Franchisor, lawfully becomes a part of the public domain through publication or communication by others.

C.    Due to the special and unique nature of the confidential information, Marks, and Manual of Franchisor, Franchisee hereby acknowledges that Franchisor shall be entitled to immediate equitable remedies, including, but not limited to, restraining orders and injunctive relief in order to safeguard such proprietary, confidential, unique, and special information of Franchisor and that money damages alone would be an insufficient remedy with which to compensate Franchisor for any breach of the terms of Paragraphs V, VI and VII of this Agreement. All owners, directors, shareholders, partners and employees of Franchisee having access to the confidential and proprietary information of Franchisor shall be required to execute nondisclosure agreements in the form acceptable to Franchisor.

VIII.    <u>MODIFICATION OF THE SYSTEM</u>

Franchisee acknowledges that, from time to time hereafter, Franchisor may change or modify the System presently identified by the Marks, including, without limitation, the adoption and use of new or modified trade names, trademarks, service marks or copyrighted materials, new Menu Items, new products, new equipment or new techniques, and such modifications will be communicated to Franchisee through the Manual. Franchisee shall accept, use and display for the purposes of this Agreement any such changes in the System as if they were part of this Agreement at the time of execution hereof. Franchisee shall make such expenditures as are reasonably required by such changes or modifications in the System. Franchisee shall not change, modify or alter in any way the System.

IX.    **ADVERTISING**

Recognizing the value of advertising and the importance of the standardization of advertising and promotion to the furtherance of the goodwill and the public image of JIMMY JOHN'S Franchised Restaurants, Franchisee agrees as follows:

A.    Franchisee will submit to Franchisor or its designated agency, for its prior approval, all promotional materials and advertising to be used by Franchisee, including, but not limited to, newspaper, radio and television advertising, specialty and novelty items, signs, containers and boxes. In the event written disapproval of said advertising and promotional materials is not given by Franchisor to Franchisee within thirty (30) days from the date such material is received by Franchisor, said materials shall be deemed approved. Failure by Franchisee to conform with the provisions herein and subsequent nonaction by Franchisor to require Franchisee to cure or remedy this failure and default shall not be deemed a waiver of future or additional failures and defaults of any other provision of this Agreement. The submission of advertising to Franchisor for approval shall not affect Franchisee's right to determine the prices at which Franchisee sells its products or services.

B.    Franchisee shall spend between THREE THOUSAND DOLLARS ($3,000.00) and FOUR THOUSAND DOLLARS ($4,000.00) on newspaper, direct mail, advertising or promotional items through other media including, without limitation, product samples, during the initial sixty (60) days of operation of the Franchised Restaurant ("Grand Opening Advertising"). Franchisor reserves the right to adjust the Grand Opening Advertising requirements to most accurately reflect the amount required within Franchisee's market area. Such Grand Opening Advertising shall be conducted in accordance with the Manual. Franchisor shall establish guidelines for Grand Opening Advertising and shall provide such guidelines to Franchisee prior to or during the initial training program.

C.    Franchisor has established the JIMMY JOHN'S Advertising and Development Fund ("Fund"). Franchisee shall contribute to the Fund an amount not to exceed four and one-half percent (4.5%) of the Gross Sales derived from the Franchised Restaurant, as defined in Paragraph X.A. of this Agreement. Franchisee's required payments to the Fund shall be made at the same time and in the same manner as, and in addition to, the Continuing Services and Royalty Fee provided in Paragraph X herein. Such payment shall be made in addition to and exclusive of any sums that Franchisee may be required to spend on local advertising and promotion. The Fund shall be maintained and administered by Franchisor or its designee as follows:

1.    Franchisor shall direct all advertising programs with control over the creative concepts, materials and media used in such programs and the placement and allocation thereof. Franchisee agrees and acknowledges that the Fund is intended to maximize general public recognition and acceptance of the Marks for the benefit of the System and that Franchisor and its designee undertake no obligation in administering the Fund to make expenditures for Franchisee which are equivalent or proportionate to

its contribution or to ensure that any particular Franchisee benefits directly pro rata from the placement of advertising.

2.     The Fund may be used to meet any and all costs of maintaining, administering, directing, producing and preparing promotions and advertising (including, without limitation, the cost of conducting public relations activities; conducting advertising; producing promotional brochures and other marketing materials to franchisees in the System; and developing electronic media, including Websites). All sums paid by Franchisee to the Fund shall be maintained in a separate account from the other funds of Franchisor and shall not be used to defray any of Franchisor's general operating expenses, except for such reasonable administrative costs and overhead, if any, as Franchisor may incur in activities reasonably related to the administration or direction of the Fund and advertising programs, including, without limitation, conducting market research, preparing marketing, advertising and other materials, and collecting and accounting for assessments to the Fund.

3.     It is anticipated that all contributions to the Fund shall be expended for advertising and promotional purposes during Franchisor's fiscal year within which contributions are made. If, however, excess amounts remain in the Fund at the end of such fiscal year, all expenditures in the following fiscal year(s) shall be made first out of any current interest or other earnings of the Fund, next out of any accumulated earnings, and finally from principal.

4.     Although Franchisor intends the Fund to be of perpetual duration, Franchisor maintains the right to terminate the Fund. The Fund shall not be terminated, however, until all monies in the Fund have been expended for advertising and promotional purposes.

5.     An accounting of the operation of the Fund shall be prepared annually and shall be made available to Franchisee upon request. Franchisor reserves the right, at its option, to require that such annual accounting include an audit of the operation of the Fund prepared by an independent certified public accountant selected by Franchisor and prepared at the expense of the Fund.

D.     After the initial sixty (60) days of Grand Opening Advertising, Franchisee shall spend each calendar month on local advertising and promotion an amount equal to one-half percent (.5%) of Franchisee's Gross Sales, as defined in Paragraph X.A.2 of this Agreement. Such expenditures shall be made directly by Franchisee, subject to approval and direction by Franchisor or Franchisor's designated advertising agency. Within thirty (30) days of the end of each calendar month, Franchisee shall furnish to Franchisor, in a manner approved by Franchisor, an accurate accounting of Franchisee's expenditures on local advertising and promotion for the preceding calendar month just ended. Franchisor will provide guidelines for local advertising, and any deviation from such guidelines requires the prior approval of Franchisor.

E.    From time to time Franchisor may designate a local, regional or national advertising coverage area in which Franchisee's business and at least one (1) other JIMMY JOHN'S franchise is located for purposes of developing a cooperative local, regional or national advertising or promotional program. Franchisee agrees to participate in and contribute its share to such cooperative advertising and promotional programs in Franchisee's advertising coverage areas in addition to such contributions and expenditures as required pursuant to Paragraphs IX.B. and IX.C.  The cost of the program shall be allocated among locations in such area, and each Franchisee's share shall be in proportion to its sales during the preceding twelve (12) month period or portion of said period.  Said contributions to cooperative advertising promotional programs will be credited toward the local advertising and promotional expenditure required by Paragraph IX.D. "Advertising Coverage Area" shall be defined as the area covered by the particular advertising medium (television, radio, or other medium) as recognized in the industry. At the time a program is submitted, Franchisor shall submit a list to Franchisee of all operating JIMMY JOHN'S facilities within the Advertising Coverage Area. If fifty percent (50%) or more of the franchisees within the Advertising Coverage Area elect to increase the expenditures for cooperative advertising, Franchisee shall make contributions to cooperative advertising proportionate to the contributions of other franchisees within the Advertising Coverage Area; provided, however, in no event shall Franchisee's combined expenditures for local advertising (as required in Paragraph IX.D. herein) or cooperative advertising exceed six and one-half percent (6.5%) of the Gross Sales derived from the Franchised Restaurant.

F.    Franchisee shall maintain a listing in boldface type in the white pages of the local telephone directory and advertise continuously in the classified or Yellow Pages of the local telephone directory. Franchisee shall maintain a Yellow Page listing in boldface type under the listing "Restaurant" and such other listings of the size and type deemed appropriate by Franchisor. When more than one (1) JIMMY JOHN'S Restaurant serves a metropolitan area, classified advertisements shall list all JIMMY JOHN'S Restaurants operating within the distribution area of such classified directories, and Franchisee shall contribute its equal share to the cost of such advertisement, which shall be credited toward the local advertising required in Paragraph IX.D. hereof.

G.    Franchisee shall not advertise or use in advertising or any other form of promotion the copyrighted materials, trademarks, service marks or commercial symbols of Franchisor without the appropriate © or ® registration marks or the designation ™ or ℠ where applicable.

X.    CONTINUING SERVICES AND ROYALTY FEE

A.    Franchisee shall pay, without offset, credit or deduction of any nature, to Franchisor, so long as this Agreement shall be in effect, a weekly Continuing Services and Royalty Fee equal to six percent (6%) of the Gross Sales derived from the Franchised Restaurant. Said Continuing Services and Royalty Fee shall be paid weekly in the manner specified below or as otherwise prescribed in the Manual.

1.  On or before Wednesday of each week, Franchisee will submit to Franchisor, on a form approved by Franchisor, a correct statement, signed by Franchisee, of Franchisee's Gross Sales and weekly inventory for the preceding week ended Tuesday. Each weekly statement of Gross Sales shall be accompanied by the Continuing Services and Royalty Fee payment based on the Gross Sales reported in the statement so submitted. Franchisee will make available to Franchisor all original books and records that Franchisor may deem necessary to ascertain Franchisee's Gross Sales for reasonable inspection at reasonable times.

2.  The term "Gross Sales," as used herein and throughout this Agreement, shall mean and include the total of all revenues and income from the sale of all Trade Secret Food Products, other food products, beverages and other related merchandise, products and services to customers of Franchisee, or any other source, whether or not sold or performed at or from the JIMMY JOHN'S Franchised Restaurant. There will be deducted from Gross Sales for purposes of said computation (but only to the extent they have been included) the amount of all sales tax receipts or similar tax receipts which, by law, are chargeable to customers, if such taxes are separately stated when the customer is charged and if such taxes are paid to the appropriate taxing authority.

B.  All Continuing Services and Royalty Fees, advertising contributions, amounts due for purchases by Franchisee from Franchisor, and other amounts which Franchisee owes to Franchisor shall bear interest after their due date at the highest commercial contract interest rate allowed by law, not to exceed one and one-half percent (1.5%) per month. Franchisee acknowledges that this Paragraph shall not constitute agreement by Franchisor to accept such payments after same are due or a commitment by Franchisor to extend credit to, or otherwise finance Franchisee's operation of, the Franchised Restaurant. Further, Franchisee acknowledges that its failure to pay all amounts when due shall constitute grounds for termination of this Agreement, as provided in Paragraph XVI hereof, notwithstanding the provisions of this Paragraph.

C.  Notwithstanding any designation by Franchisee, Franchisor shall have the right to apply any payments by Franchisee to any past due indebtedness of Franchisee for Continuing Services and Royalty Fees, advertising contributions, purchases from Franchisor, interest or any other indebtedness.

D.  All Continuing Services and Royalty Fees, advertising contributions, amounts due for purchases by Franchisee from Franchisor and other amounts which Franchisee owes to Franchisor shall be paid through an Electronic Depository Transfer Account ("Electronic Depository Transfer Account") as further described in the Manual. Immediately following execution of this Agreement, Franchisee shall set up an Electronic Depository Transfer Account, and Franchisor shall have access to such account for the purpose of receiving payment for Continuing Services and Royalty Fees, advertising contributions, amounts due for purchases by Franchisee from Franchisor and any other amounts which Franchisee owes to Franchisor. Every week, Franchisee shall make deposits to the fund sufficient to cover amounts owed to Franchisor on Tuesday for Continuing Services and Royalty Fees, advertising contributions, and other funds

owed to Franchisor. Deposits for all other amounts owed to Franchisor shall be in accordance with the procedures set forth in the Manual.

E.    Franchisee shall pay to Franchisor (or any related entities) promptly and when due the amount of all sales taxes, use taxes, personal property taxes and similar taxes imposed upon, required to be collected, or paid by Franchisor on the account of services or goods furnished by Franchisor to Franchisee through sale, lease or otherwise, or on account of collection by Franchisor of the initial franchise fee called for by this Agreement.

## XI.    ACCOUNTING AND RECORDS

A.    Franchisee shall maintain during the term of this Agreement, and shall preserve for the time period specified in the Manual, full, complete, and accurate books, records, and accounts in accordance with the standard accounting system prescribed by Franchisor in the Manual or otherwise in writing. Franchisee shall retain for a period of three (3) years thereafter all books and records related to the Franchised Restaurant, including, without limitation, sales checks, purchase orders, invoices, payroll records, customer lists, check stubs, sales tax records and returns, cash receipts and disbursement journals and general ledgers.

B.    Franchisee will supply to Franchisor at the end of each calendar quarter, in the form approved by Franchisor, a profit and loss statement and balance sheet and submit copies of all purchases for the last preceding three (3) month period just ended. Additionally, Franchisee shall, at its expense, submit to Franchisor within ninety (90) days after the end of each fiscal year during the term of this Agreement a profit and loss statement for such fiscal year and a balance sheet as of the last day of such fiscal year, prepared on an accrual basis, including all adjustments necessary for fair presentation of the financial statements. Such financial statements will be certified to be true and correct by Franchisee. Franchisor reserves the right to require annual financial statements, prepared in accordance with generally accepted accounting standards, audited by an independent certified public accountant.

C.    Franchisee shall submit to Franchisor such other periodic reports, forms and records as specified and in the manner and at the time as specified in the Manual or as Franchisor shall otherwise require in writing from time to time.

D.    Franchisee shall record all sales and related activities on computer-based point-of-sale cash registers which are fully compatible with any program or system which Franchisor, in its discretion, may now or in the future employ. Franchisee must procure a computer system meeting the specifications and standards prescribed by Franchisor. All Gross Sales and sales information shall be recorded on such equipment. Franchisor shall have full access to all of Franchisee's data, system and related information by means of direct access whether in person or by telephone/modem. Franchisor may require Franchisee to obtain specified computer hardware and/or software and modify specifications for and components of the computer system from time to time. Modification of specifications for the computer system and/or other technological developments or events, such as "Year 2000," might require Franchisee to purchase, lease, and/or license new or modified computer hardware and/or

software and to obtain service and support for the computer system. Although Franchisor cannot estimate the future costs of the computer system, Franchisee agrees to incur the costs of obtaining the computer hardware and software comprising the computer system (or additions and modifications) and required service or support. Within sixty (60) days after Franchisee receives notice, Franchisee agrees to obtain the components of the computer system that Franchisor designates. Franchisor may charge Franchisee a reasonable fee for modifying and enhancing proprietary software that Franchisor licenses to Franchisee and for other computer system maintenance and support services that Franchisor or its affiliates provide. If Franchisor or its affiliates license proprietary software to Franchisee, Franchisee agrees to sign any Software License Agreement or similar document that Franchisor or its affiliates prescribe to regulate Franchisee's use of, and the parties' respective rights and responsibilities with respect to, the software.

E.    Franchisor or its designated agents shall have the right at all reasonable times to examine and copy, at its expense, the books, records, and tax returns of Franchisee. Franchisor shall also have the right, at any time, to have an independent audit made of the books and records of Franchisee at Franchisor's expense. If an inspection should reveal that any payments due to Franchisor have been understated in any report to Franchisor, then Franchisee shall immediately pay to Franchisor the amount understated upon demand, in addition to interest from the date such amount was due until paid, at the rate provided in Paragraph X.B. If an inspection discloses an understatement in any report of two percent (2%) or more, Franchisee shall, in addition, reimburse Franchisor for any and all costs and expenses connected with the inspection (including, without limitation, reasonable accounting and attorneys' fees). The foregoing remedies shall be in addition to any other remedies Franchisor may have.

F.    Franchisee acknowledges that nothing contained herein constitutes Franchisor's Agreement to accept any payments after same are due or a commitment by Franchisor to extend credit to or otherwise finance Franchisee's operation of the Franchised Restaurant. Further, Franchisee acknowledges that its failure to pay all amounts when due shall constitute a material default of and grounds for termination of this Agreement.

XII.    STANDARDS OF QUALITY AND PERFORMANCE

A.    Franchisee shall comply with all requirements set forth in this Agreement, the Manual and other written policies supplied to Franchisee by Franchisor. Mandatory specifications, standards, operating procedures and rules prescribed from time to time by Franchisor in the Manual or otherwise communicated to Franchisee in writing shall constitute provisions of this Agreement as if fully set forth herein and shall be reasonably and uniformly applied to all franchisees, subject to Franchisor's rights under Paragraph I.E. All references herein to this Agreement shall include all such mandatory specifications, standards and operating procedures and rules. Franchisee shall comply with the entire System, including, but not limited to, the requirements of this Paragraph XII.

B.    Franchisee shall commence operation of the Franchised Restaurant not later than one hundred twenty (120) days after execution of this Agreement or as otherwise required or

approved in writing by Franchisor. Prior to such opening, Franchisee shall have procured all necessary licenses, permits, and approvals, including, but not limited to, construction permits; hired and trained personnel; made all leasehold improvements; and purchased initial inventory. If Franchisee for any reason fails to commence operation as herein provided, unless Franchisee is precluded from doing so by force majeure, such failure shall be considered a default, and Franchisor may terminate this Agreement as herein provided.

C.    Franchisee shall maintain the condition and appearance of the Premises of the Franchised Restaurant consistent with Franchisor's quality controls and standards. Franchisee shall effect such reasonable maintenance of the Franchised Restaurant as is from time to time required to maintain or improve the appearance and efficient operation of the Franchised Restaurant, including, but not limited to, replacement of worn out or obsolete fixtures and signs, repair of the exterior and interior of the Premises of the Franchised Restaurant, and purchasing and installation of new or modified equipment. If at any time in Franchisor's judgment the general state of repair or the appearance of the Premises of the Franchised Restaurant or its equipment, fixtures, signs or decor does not meet Franchisor's quality control and standards therefor, Franchisor shall so notify Franchisee, specifying the action to be taken by Franchisee to correct such deficiency. If Franchisee fails or refuses to initiate within thirty (30) days after receipt of such notice, and thereafter continue, a bona fide program to complete any required maintenance, Franchisor shall have the right, in addition to all other remedies, to enter upon the Premises of the Franchised Restaurant and effect such repairs, painting, maintenance or replacements of equipment, fixtures or signs on behalf of Franchisee, and Franchisee shall pay the entire costs thereof on demand. Franchisee's obligation to initiate and continue any required maintenance shall be suspended during any period in which such maintenance is impractical due to force majeure. Franchisor has the right to add additional authorized services that Franchisee must offer. There are no limits on Franchisor's right to do so except that the investment required of a Franchisee (for equipment, supplies and initial inventory) will not exceed TEN THOUSAND DOLLARS ($10,000.00) per year.

D.    Franchisee shall make no material alterations to the Premises of the Franchised Restaurant nor make material replacements of or alterations to the equipment, fixtures or signs of the Franchised Restaurant without the prior written approval of Franchisor.

E.    The location of the Franchised Restaurant approved by Franchisor in accordance with Paragraph III hereof shall be used solely for the purpose of conducting a JIMMY JOHN'S Franchised Restaurant.

F.    Franchisor and its affiliate have developed Trade Secret Food Products and will continue to further develop and own proprietary recipes. In order to protect its trade secrets and to monitor the manufacture, packaging, processing and sale of Trade Secret Food Products, Franchisor or its affiliate will (i) manufacture, supply, and sell Trade Secret Food Products to franchisees of Franchisor; and/or (ii) disclose the formulae for and methods of preparation of the Trade Secret Food Products to a limited number of suppliers who will be authorized by Franchisor or its affiliates to manufacture Trade Secret Food Products to Franchisor's precise specifications and sell Trade Secret Food Products to franchisees of Franchisor. Franchisee

acknowledges that Franchisee will be required to purchase and use Trade Secret Food Products from Franchisor or a limited number of suppliers so authorized by Franchisor, which may include or even be limited to Franchisor's affiliates.

G.    Franchisee shall offer for sale and sell at the Franchised Restaurant all types of Menu Items and other categories of food and beverage products that Franchisor from time to time authorizes and shall not offer for sale or sell at the Franchised Restaurant or the Premises any other category of products or use such Premises for any purpose other than the operation of a Franchised Restaurant in full compliance with this Agreement.

H.    In order to ensure that all Menu Items produced by Franchisee meet Franchisor's high standards of taste, texture, appearance and freshness, and in order to protect Franchisor's goodwill and Marks, all Trade Secret Food Products, Menu Items and other food products shall be prepared only by properly trained personnel strictly in accordance with Franchisor's recipes, cooking techniques and processes as designated by Franchisor in the Manual and shall be sold only at retail to customers in conformity with Franchisor's marketing plan and concept. Franchisee acknowledges that such recipes, cooking techniques and processes are integral to the System, and failure to adhere to such recipes, cooking techniques and processes (including the handling and storage of both ingredients and fully prepared Menu Items) shall be detrimental to the System and Marks.

I.    From time to time, Franchisor shall provide to Franchisee a list of approved manufacturers, suppliers and distributors ("Approved Suppliers List") and approved inventory, products, fixtures, furniture, equipment, signs, stationery, supplies, and other items or services necessary to operate the Franchised Restaurant ("Approved Supplies List"). Such lists shall specify the manufacturer, brand name, supplier and distributor and the inventory products, fixtures, furniture, equipment, signs, stationery, supplies and services which Franchisor has approved to be carried or used in the System. Franchisor may revise the Approved Suppliers List and Approved Supplies List from time to time, and such lists shall be submitted to Franchisee as Franchisor deems advisable. If Franchisee proposes to offer for sale at the Franchised Restaurant any brand of product, or to use in the operation of the Franchised Restaurant any brand of food ingredient or other material or supply, which is not then approved by Franchisor as meeting its minimum specifications and quality standards, or to purchase any product from a supplier that is not then designated by Franchisor as an approved supplier, Franchisee shall first notify Franchisor and shall upon request by Franchisor submit samples and such other information as Franchisor requires for examination and/or testing or to otherwise determine whether such product, material or supply, or such proposed supplier, meets its specifications and quality standards. A charge not to exceed the reasonable cost of the inspection and evaluation and the actual cost of the test shall be paid by Franchisee or the supplier. Franchisor need not approve Franchisee's request. Franchisor reserves the right, at its option, to re-inspect the facilities and products of any supplier of an approved item and to revoke its approval of any item which fails to continue to meet any of Franchisor's criteria. Franchisor reserves the right to approve or disapprove any and all supplies, suppliers, brand name products and other products and services, whether currently approved by Franchisor or submitted to Franchisor by Franchisee for approval, authorized for use by or sale from the Franchised Restaurant. Franchisee agrees that, despite

anything to the contrary contained in this Agreement, Franchisor may limit the number of suppliers with whom Franchisee may deal and may require that Franchisee deal, with respect to one or more categories of items or services, only with Franchisor and/or its affiliates, in which case Franchisor and/or its affiliates will be deemed to be designated suppliers. Franchisee also acknowledges and agrees that Franchisor and its affiliates have the right to receive payments from suppliers on account of their dealings with Franchisee and other franchisees and to use all amounts received without restriction (unless instructed otherwise by the supplier) for any purposes they deem appropriate.

J.    All inventory, products and materials, and other items and supplies used in the operation of the Franchised Restaurant which are not specifically required to be purchased in accordance with Franchisor's Approved Supplies List and Approved Suppliers List shall conform to the specifications and quality standards established by Franchisor from time to time.

K.    Franchisee shall secure and maintain in force all required licenses, permits and certificates relating to the operation of the Franchised Restaurant and shall operate the Franchised Restaurant in full compliance with all applicable laws, ordinances and regulations, including, without limitation, all government regulations relating to occupational hazard and health, dispensing of food products, consumer protection, trade regulation, workers' compensation, unemployment insurance, and withholding and payment of federal and state income taxes, social security taxes, and sales, use and property taxes.

L.    Franchisee shall refrain from any merchandising, advertising or promotional practice which is unethical or may be injurious to the business of Franchisor and/or other Franchised Restaurants or to the goodwill associated with the Marks.

M.    Franchisee shall in the operation of the Franchised Restaurant use only displays, trays, napkins, boxes, bags, wrapping paper, labels, forms and other paper and plastic products imprinted with the Marks and colors as prescribed from time to time by Franchisor, and shall purchase such items only from such third parties licensed by Franchisor to duplicate the Mark on such items.

N.    Franchisee acknowledges that the Franchised Restaurant shall at all times maintain an inventory of ingredients, food and beverage products and other products, materials and supplies that will permit operation of the Franchised Restaurant at maximum capacity.

O.    The Franchised Restaurant shall at all times be under the direct, on-premises supervision of Franchisee (or a trained and competent employee acting as full-time manager). If Franchisee employs a full-time manager, however, Franchisee acknowledges that it will remain obligated to supervise the operations of the Franchised Restaurant as agreed upon by Franchisee and Franchisor. In the event Franchisee operates more than one (1) franchise, at least one (1) trained and competent employee referred to above shall act as a full-time manager. Franchisee shall keep Franchisor informed at all times of the identity of any employee(s) acting as manager(s) of the Franchised Restaurant. To the extent that Franchisor can reasonably accommodate Franchisee's manager in Franchisee's regularly scheduled training course,

Franchisor shall make training available, as is reasonable and necessary, for all managers designated by Franchisee. Franchisor shall provide such training at the then-current published rates. In no event will Franchisor be under any obligation to provide individual training to Franchisee's managers. Franchisee shall, at all times, faithfully, honestly and diligently perform its obligations hereunder and not engage in any business or other activities that will conflict with its obligations hereunder.

P.   Franchisee shall not install or maintain on the Premises of the Franchised Restaurant any newspaper racks, video games, juke boxes, gaming machines, gum machines, games, rides, vending machines or other similar devices without the written approval of Franchisor.

Q.   If directed by Franchisor, Franchisee shall participate actively in a JIMMY JOHN'S Regional Advisory Franchisee Council ("Council") and participate in all Council programs for Franchisee's particular Council approved by Franchisor. The purposes of the Council(s) include, but are not limited, to, exchanging ideas and problem solving methods, advising Franchisor on expenditures for regional advertising, providing back-up support and staffing for political influence, and coordinating franchisee efforts. Franchisee shall pay all assessments levied by the Council, and Franchisor has the right to enforce this obligation. Amounts and expenditures may vary from time to time and due to variations in Council participation and costs as determined by a particular Council and as approved by Franchisor. Although Franchisee shall pay such Council assessments, such assessments shall in no way diminish Franchisee's rights and the benefit of the bargain under this Agreement. Such Council(s) may be formed by Franchisor at such time that more than one (1) franchisee conducts a Franchised Restaurant in any given region, the boundaries of such region to be determined by Franchisor.

R.   Franchisee shall attend an annual meeting of all JIMMY JOHN'S Franchisees to be conducted at a location designated by Franchisor. Franchisee shall bear all costs incurred by Franchisee and its employees in attending such annual meeting, including, without limitation, travel costs, room and board expenses and employees' salaries. Attendance at such annual meeting shall not be required more than two (2) days during any calendar year.

S.   Franchisee's employees shall at all times wear uniforms imprinted with the Marks as prescribed by Franchisor in the Manual. Franchisee shall maintain such uniforms through use of a commercial uniform service.

T.   Franchisee shall notify Franchisor in writing within five (5) days of the commencement of any action, suit, or proceeding, and of the issuance of any order, writ, injunction, award or decree of any court, agency, or other governmental instrumentality, which may adversely affect the operation or financial condition of the Franchised Restaurant.

U.   Franchisee shall not provide delivery services until the Franchised Business has been in operation for a minimum of sixty (60) days.

## XIII. FRANCHISOR'S OPERATIONS ASSISTANCE

A.   Franchisor may from time to time advise or offer guidance to Franchisee relative to prices for the food and other products offered for sale by the Franchised Restaurant that in Franchisor's judgment constitute good business practice. Such guidance will be based on the experience of Franchisor and its franchisees in operating Franchised Restaurants and an analysis of the costs of such products and prices charged for competitive products. Franchisee shall not be obligated to accept any such advice or guidance and shall have the sole right to determine the prices to be charged by the Franchised Restaurant, and no such advice or guidance shall be deemed or construed to impose upon Franchisee any obligation to charge any minimum prices for any product offered for sale by the Franchised Restaurant.

B.   Upon commencement of operation of the Franchised Restaurant, and during the term of this Agreement, Franchisor may provide to Franchisee the following:

1.   A comprehensive list of established sources of equipment, foods, supplies and containers necessary for the operation of the Franchised Restaurant and provide specifications for such products;

2.   Coordination of product distribution for local, regional and national suppliers;

3.   Regulation of quality standards and products in conformance throughout the network of Franchised Restaurants;

4.   Coordination of advertising materials and strategies; and

5.   Negotiation of group rates for purchases of products and materials as Franchisor deems necessary and appropriate.

C.   Franchisor may furnish Franchisee with such assistance in connection with the operation of the Franchised Restaurant as is reasonably determined to be necessary by Franchisor from time to time. Operations assistance may consist of advice and guidance with respect to:

1.   Proper utilization of procedures by the Franchised Restaurant regarding the service and sale of all Menu Items, other food and beverage items, and related items and materials as approved by Franchisor;

2.   Additional products and services authorized for sale from JIMMY JOHN'S Restaurants;

3.   Purchase of ingredients and other food and beverage items, materials and supplies;

23

4.   The institution of proper administrative, bookkeeping, accounting, inventory control, supervisory and general operating procedures for the effective operation of the Franchised Restaurant;

5.   Advertising and promotional programs; and

6.   Ongoing research and development of new procedures and techniques, new products and materials and other enhancements to the System.

D.   Franchisor may make periodic visits to the Franchised Restaurant for the purposes of consultation, assistance, and guidance of Franchisee in all aspects of the operation and management of the Franchised Restaurant. Franchisor or Franchisor's representatives who visit the Franchised Restaurant may prepare, for the benefit of both Franchisor and Franchisee, written reports with respect to such visits outlining any suggested changes or improvements in the operations of the Franchised Restaurant and detailing any defaults in such operations which become evident as a result of any such visit, and a copy of each such written report shall be provided to both Franchisor and Franchisee. Franchisor shall advise Franchisee of problems arising out of the operation of the Franchised Restaurant as disclosed by reports submitted to Franchisor by Franchisee or by inspections conducted by Franchisor of the Franchised Restaurant.

E.   All of the specifications, Approved Suppliers Lists, Approved Supplies Lists, training and operations manuals to be provided by Franchisor to Franchisee pursuant to this Agreement shall be delivered within thirty (30) days after execution of this Agreement.

XIV.   **INSURANCE**

A.   Franchisee shall procure at its expense and maintain in full force and effect during the term of this Agreement an insurance policy or policies protecting Franchisee and Franchisor, and their officers, directors and employees, against any loss, liability, personal injury, death, or property damage or expense whatsoever arising or occurring upon or in connection with the Franchised Restaurant, as Franchisor may reasonably require for its own and Franchisee's protection. Franchisor and Jimmy John's Enterprises, Inc. shall be named as additional insureds in such policy or policies.

B.   Such policy or policies shall be written by an insurance company licensed in the state in which Franchisee operates and having at least an "A" Rating Classification as indicated in Best's Key Rating Guide in accordance with standards and specifications set forth in the Manual or otherwise in writing and shall include, at a minimum (except as different coverages and policy limits may reasonably be specified for all franchisees from time to time by Franchisor in the Manual or otherwise in writing), the following:

1.   All risks coverage insurance on the Franchised Restaurant and all fixtures, equipment, supplies, products and other property used in the operation of the Franchised Restaurant (which coverage may include flood and/or earthquake coverage,

where applicable, and theft insurance) for full repair and replacement value without any applicable co-insurance clause, except that an appropriate deductible clause shall be permitted.

2.    Workers' compensation and employer's liability insurance as well as such other insurance as may be required by statute or rule of the state or county in which the Franchised Restaurant is located and operated.

3.    Comprehensive general liability insurance and product liability insurance including a per premises aggregate with the following coverages: broad form contractual liability; personal and advertising injury; fire damage; and products/completed operations, insuring Franchisor and Franchisee against all claims, suits, obligations, liabilities and damages, including attorneys' fees, based upon or arising out of actual or alleged personal injuries or property damage resulting from, or occurring in the course of, or on or about or otherwise relating to the Franchised Restaurant, including General Aggregate coverage in the following limits:

| Recommended Coverage | Minimum Limits of Coverage |
|---|---|
| General Aggregate | $1,000,000.00 |
| Products/Completed Operations Aggregate | $1,000,000.00 |
| Personal and Advertising Injury | $1,000,000.00 |
| Each Occurrence | $1,000,000.00 |
| Fire Damage (any one fire) | $50,000.00 |
| Medical Expense any one person | $5,000.00 |

The amounts required herein may be modified from time to time by Franchisor to reflect inflation or future experience with claims.

4.    Business interruption insurance for actual losses sustained.

5.    Automobile liability insurance, including owned, hired and non-owned vehicle coverage, with a combined single limit of at least ONE MILLION DOLLARS ($1,000,000.00).

6.    Such insurance and types of coverage as may be required by the terms of any lease for the Franchised Restaurant or as may be required from time to time by Franchisor.

C.    The insurance afforded by the policy or policies respecting liability shall not be limited in any way by reason of any insurance which may be maintained by Franchisor. Within ninety (90) days of the signing of this Agreement, but in no event later than the date on which Franchisee acquires an interest in the real property from which it will operate the Franchised Restaurant, a Certificate of Insurance showing compliance with the foregoing requirements shall be furnished by Franchisee to Franchisor for approval. Such certificate shall state that said policy

or policies will not be canceled or altered without at least twenty (20) days' prior written notice to Franchisor and shall reflect proof of payment of premiums. Maintenance of such insurance and the performance by Franchisee of the obligations under this Paragraph shall not relieve Franchisee of liability under the indemnity provision set forth in this Agreement. Minimum limits as required above may be modified from time to time, as conditions require, by written notice to Franchisee.

D.    Should Franchisee, for any reason, not procure and maintain such insurance coverage as required by this Agreement, Franchisor shall have the right and authority (without, however, any obligation to do so) immediately to procure such insurance coverage and to charge same to Franchisee, which charges, together with a reasonable fee for expenses incurred by Franchisor in connection with such procurement, shall be payable by Franchisee immediately upon notice.

## XV.    COVENANTS

A.    Unless otherwise specified, the term "Franchisee" as used in this Paragraph XV shall include, collectively and individually, Franchisee as defined in Paragraph XXXII.

B.    Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee (if Franchisee is an individual), an owner of a beneficial interest of ten percent (10%) or more of the securities or membership interests of Franchisee (if Franchisee is a corporation or limited liability company), a general partner of Franchisee (if Franchisee is a partnership), or Franchisee's full-time manager shall devote full time energy and best efforts to the management and operation of the Franchised Restaurant.

C.    Franchisee covenants that during the term of this Agreement, except as otherwise approved in writing by Franchisor, Franchisee shall not, either directly or indirectly, for himself or through, on behalf of, or in conjunction with any person, persons, partnership, or corporation:

1.    Divert or attempt to divert any business or customer of the Franchised Restaurant to any competitor, by direct or indirect inducement or otherwise, or do or perform, directly or indirectly, any other act injurious or prejudicial to the goodwill associated with the Marks or the System.

2.    Employ or seek to employ any person who is employed as a General Manager or Assistant Manager of Franchisor's Affiliate (Jimmy John's Enterprises, Inc.) or another franchisee or who was employed as a General Manager or Assistant Manager of Franchisor's Affiliate or another franchisee within twenty-four (24) months of the individual's employment termination date without first obtaining written consent from Jimmy John's Enterprises, Inc. or that other franchisee.

3.    Own, maintain, engage in, or have any interest in any business (including any business operated by Franchisee prior to entry into this Agreement) specializing in whole or in part in dispensing, promoting or selling prepared food products or any other

business which sells or offers to sell prepared food products or services the same as or similar to those sold in the System.

D. Franchisee specifically acknowledges that, pursuant to this Agreement, Franchisee will receive valuable training and confidential information, including, without limitation, information regarding the promotional, operational, sales and marketing methods and techniques of Franchisor and the System. Accordingly, Franchisee covenants that, except as otherwise approved in writing by Franchisor, Franchisee shall not, for a period of one (1) year after the expiration or termination of this Agreement, regardless of the cause of termination, either directly or indirectly, for himself or through, on behalf of, or in conjunction with any person, persons, partnership, or corporation, own, maintain, engage in, consult with or have any interest in any restaurant business or prepared food business engaged primarily in the preparation and sale of prepared food products or services the same as or similar to the type sold in the System:

> 1. Within the Metropolitan Statistical Area, as that term is defined by the United States Census Bureau ("MSA") in which the Franchised Restaurant is located; or

> 2. Within a radius of ten (10) miles of the Franchised Restaurant; or

> 3. Within a radius of ten (10) miles of the location of any other business using the System, whether franchised or owned by Franchisor or its affiliates.

If any person restricted by this Paragraph XV (including those identified in Paragraph XV.H.) refuses voluntarily to comply with the obligations in this Paragraph XV.D., the one (1) year period for that person will commence with the entry of a court order enforcing this provision.

E. Franchisee shall not divulge to any person, partnership, corporation or any other entity any information, trade secrets, ingredients, recipes, cooking techniques and processes used in the Trade Secret Food Products, Menu Items and other food and beverage products used in the System or any information stated in the Manual.

F. Each of the foregoing covenants shall be construed as independent of any other covenant or provision of this Agreement. If all or any portion of a covenant in this Paragraph XV is held unreasonable or unenforceable by a court or agency having valid jurisdiction in an unappealed final decision to which Franchisor is a party, Franchisee shall be bound by any lesser covenant subsumed within the terms of such covenant that imposes the maximum duty permitted by law, as if the resulting covenant were separately stated in and made a part of this Paragraph XV.

G. Franchisee understands and acknowledges that Franchisor shall have the right to reduce the scope of any covenant set forth in Paragraphs XV.C. and XV.D. in this Agreement, or any portion thereof, without Franchisee's consent, effective immediately upon receipt by Franchisee of written notice thereof, and Franchisee shall comply forthwith with any covenant as

so modified, which shall be fully enforceable notwithstanding the provisions of Paragraph XXVII hereof.

H.    Franchisor shall have the right to require all of Franchisee's officers, directors, owners, shareholders, general partners, limited partners, and personnel performing managerial or supervisory functions, and all personnel receiving training from Franchisor, to execute similar covenants in a form satisfactory to Franchisor.

## XVI.    DEFAULT AND TERMINATION

A.    If Franchisee is in substantial compliance with this Agreement and Franchisor materially breaches this Agreement and fails to cure such breach within a reasonable time after written notice thereof is delivered to Franchisor, Franchisee may terminate this Agreement. Such termination shall be effective thirty (30) days after delivery to Franchisor of written notice that such breach has not been cured and Franchisee elects to terminate this Agreement. A termination of this Agreement by Franchisee for any reason other than breach of this Agreement by Franchisor and Franchisor's failure to cure such breach within a reasonable time after receipt of written notice thereof shall be deemed a termination by Franchisee without cause.

B.    This Agreement shall terminate automatically upon delivery of written notice of termination to Franchisee if Franchisee or its owner(s), officer(s), or manager(s):

1.    Fails to satisfactorily complete the training program as provided in Paragraph IV of this Agreement;

2.    Has made any material misrepresentation or omission in its application for the franchise;

3.    Is convicted of or pleads no contest to, where such plea is applicable, a felony or other crime or offense that is likely to adversely affect the reputation of Franchisee or the Franchised Restaurant;

4.    Makes any unauthorized use, disclosure or duplication of any portion of the Manual or duplicates or discloses or makes any unauthorized use of any trade secret or confidential information provided to Franchisee by Franchisor;

5.    Abandons or fails or refuses to actively operate the Franchised Restaurant for two (2) business days in any twelve (12) month period, unless the Franchised Restaurant has been closed for a purpose approved by Franchisor or due to force majeure, or fails to relocate to approved Premises within an approved period of time following expiration or termination of the lease for the Premises of the Franchised Restaurant;

6.    Surrenders or transfers control of the operation of the Franchised Restaurant, makes an unauthorized direct or indirect assignment of the franchise or an

ownership interest in Franchisee or fails or refuses to assign the franchise or the interest in Franchisee of a deceased or disabled controlling owner thereof as herein required;

7.    Submits to Franchisor on two (2) or more separate occasions at any time during the term of the franchise any reports or other data, information or supporting records which understate by more than three percent (3%) the Continuing Services and Royalty Fees for any period of, or periods aggregating, three (3) or more weeks, and Franchisee is unable to demonstrate that such understatements resulted from inadvertent error;

8.    If Franchisee shall be adjudicated bankrupt, becomes insolvent, commits any affirmative act of insolvency or files any action or petition of insolvency, or if a receiver (permanent or temporary) of its property or any part thereof is appointed by a court of competent authority, or if it makes a general assignment for the benefit of its creditors, or if a final judgment remains unsatisfied of record for thirty (30) days or longer (unless supersedeas bond is filed), or if execution is levied against Franchisee's business or property, or if suit to foreclose any lien or mortgage against its Premises or equipment is instituted against Franchisee and not dismissed within thirty (30) days, or is not in the process of being dismissed; provided, however, that Franchisor reserves the right to be named as trustee or receiver in any voluntary petition for bankruptcy or insolvency filed by Franchisee;

9.    Materially misuses or makes an unauthorized use of any of the Marks or commits any other act which can reasonably be expected to materially impair the goodwill associated with any of the Marks;

10.    Fails on two (2) or more separate occasions within any period of twelve (12) consecutive months to submit when due reports or other information or supporting records, to pay when due the Continuing Services and Royalty Fees, advertising contributions, amounts due for purchases from Franchisor or other payments due to Franchisor, or otherwise fails to comply with this Agreement, whether or not such failures to comply are corrected after notice thereof is delivered to Franchisee; or

11.    Continues to violate any health, safety or sanitation law, ordinance or regulation or operates the Franchised Restaurant in a manner that presents a health or safety hazard to its customers or the public.

C.    This Agreement shall terminate without further action by Franchisor or notice to Franchisee if Franchisee or Franchisee's owner:

1.    Fails or refuses to make payments of any amounts due Franchisor for Continuing Services and Royalty Fees, advertising contributions, purchases from Franchisor or any other amounts due to Franchisor and does not correct such failure or refusal within ten (10) business days after written notice of such failure is delivered to Franchisee;

2.    Fails or refuses to comply with any other provision of this Agreement, or any mandatory specification, standard or operating procedure prescribed in the Manual or otherwise in writing, and does not correct such failure within thirty (30) days (or provide proof acceptable to Franchisor that it has made all reasonable efforts to correct such failure and will continue to make all reasonable efforts to cure until a cure is effected, if such failure cannot reasonably be corrected within thirty (30) days) after written notice of such failure to comply is delivered to Franchisee.

D.    To the extent that the provisions of this Agreement provide for periods of notice less than those required by applicable law, or provide for termination, cancellation, non-renewal or the like other than in accordance with applicable law, such provisions shall, to the extent such are not in accordance with applicable law, not be effective, and Franchisor shall comply with applicable law in connection with each of these matters.

E.    In addition to Franchisor's right to terminate this Agreement, and not in lieu of such right or any other rights against Franchisee, Franchisor, in the event that Franchisee shall not have cured a default under this Agreement within the applicable time period (if a cure period is available), may, at its option, enter upon the Premises of the Franchised Restaurant and exercise complete authority with respect to the operation of the Franchised Restaurant until such time as Franchisor determines that the default of Franchisee has been cured and that there is compliance with the requirements of this Agreement. Franchisee specifically acknowledges that a designated representative of Franchisor may take over, control, and operate the Franchised Restaurant, and that Franchisee shall pay Franchisor a service fee, as published in the Manual, plus all travel expenses, room and board and other expenses reasonably incurred by such representative so long as it shall be required by the representative to enforce compliance herewith. Franchisee further acknowledges that if, as herein provided, Franchisor temporarily operates for Franchisee the Franchised Restaurant, Franchisee shall indemnify and hold harmless Franchisor and any representative of Franchisor who may act hereunder respecting any and all acts and omissions which Franchisor may perform or fail to perform as regards the interests of Franchisee or third parties.

XVII.    RIGHTS AND DUTIES OF PARTIES UPON EXPIRATION OR TERMINATION

Upon termination or expiration, this Agreement and all rights granted hereunder to Franchisee shall forthwith terminate, and:

A.    Franchisee shall immediately cease to operate the Franchised Restaurant under this Agreement, and shall not thereafter, directly or indirectly, represent to the public or hold himself out as a present or former franchisee of Franchisor.

B.    Upon demand by Franchisor, Franchisee shall assign Franchisee's interest in any lease then in effect for the Franchised Restaurant Premises to Franchisor, and Franchisee shall

furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement.

C.     Franchisee shall immediately and permanently cease to use, by advertising or in any manner whatsoever, any confidential methods, procedures, and techniques associated with the System, the Marks, or any distinctive forms, slogans, signs, symbols, logos, or devices associated with the System. In particular, Franchisee shall cease to use, without limitation, all signs, advertising materials, stationery, forms, and any other articles which display the Marks associated with the System.

D.     Franchisee shall take such action as may be necessary to cancel or assign to Franchisor or Franchisor's designee, at Franchisor's option, any assumed name rights or equivalent registration filed with state, city, or county authorities which contains the name "JIMMY JOHN'S" or any Mark, and Franchisee shall furnish Franchisor with evidence satisfactory to Franchisor of compliance with this obligation within thirty (30) days after termination or expiration of this Agreement.

E.     Franchisee shall, in the event it continues to operate or subsequently begins to operate any other business, not use any reproduction, counterfeit, copy or colorable imitation of the Marks either in connection with such other business or the promotion thereof which is likely to cause confusion, mistake or deception or which is likely to dilute Franchisor's exclusive rights in and to the Marks and shall not utilize any designation of origin or description or representation which falsely suggests or represents an association or connection with Franchisor so as to constitute unfair competition. Franchisee shall make such modifications or alterations to the Premises of the Franchised Restaurant (including, without limitation, the changing of the telephone number) immediately upon termination or expiration of this Agreement as may be necessary to prevent any association between Franchisor or the System and any business thereon subsequently operated by Franchisee or others, and shall make such specific additional changes thereto as Franchisor may reasonably request for that purpose, including, without limitation, removal of all distinctive physical and structural features identifying the System. In the event Franchisee fails or refuses to comply with the requirements of this Paragraph XVII, Franchisor shall have the right to enter upon the Premises where Franchisee's Franchised Restaurant was conducted, without being guilty of trespass or any other tort, for the purpose of making or causing to be made such changes as may be required at the expense of Franchisee, which expense Franchisee shall pay upon demand.

F.     Franchisee shall promptly pay all sums owing to Franchisor. In the event of termination for any default of Franchisee, such sums shall include all damages, costs, and expenses, including reasonable attorneys' fees, incurred by Franchisor as a result of the default.

G.     Franchisee shall pay to Franchisor all damages, costs and expenses, including reasonable attorneys' fees, incurred by Franchisor subsequent to the termination or expiration of the franchise herein granted in obtaining injunctive or other relief for the enforcement of any provisions of this Paragraph XVII or Paragraph XV.

H.    Franchisee shall immediately turn over to Franchisor all manuals, including the Manual, customer lists, records, files, instructions, brochures, agreements, and any and all other materials provided by Franchisor to Franchisee relating to the operation of the Franchised Restaurant (all of which are acknowledged to be Franchisor's property).

I.    Franchisor shall have the right, title and interest to any sign or sign faces bearing the Marks. Franchisee hereby acknowledges Franchisor's right to access the Premises of the Franchised Restaurant should Franchisor elect to take possession of any said sign or sign faces bearing the Marks.

J.    Franchisee hereby acknowledges that all telephone and facsimile numbers and Internet and electronic mail addresses used in the operation of the Franchised Business constitute assets of the Franchised Business, and, upon termination or expiration of this Agreement, Franchisee shall assign to Franchisor or its designee all of Franchisee's right, title and interest in and to Franchisee's telephone numbers and facsimile numbers and Internet addresses and shall notify the telephone company and all listing agencies of the termination or expiration of Franchisee's right to use any telephone numbers and facsimile numbers and Internet and electronic mail addresses and any regular, classified or other telephone directory listing associated with the Marks and authorize a transfer of same to or at the direction of Franchisor.

K.    Franchisor shall have the right (but not the duty), to be exercised by notice of intent to do so within thirty (30) days after termination or expiration, to purchase for cash any or all assets of the Franchised Restaurant, including leasehold improvements, equipment, supplies, and other inventory, advertising materials, and all items bearing the Marks, at Franchisee's cost or fair market value, whichever is less. If the parties cannot agree on fair market value within a reasonable time, the determination of fair market value shall be submitted to arbitration in accordance with Paragraph XXX. If Franchisor elects to exercise any option to purchase as herein provided, it shall have the right to set off all amounts due from Franchisee under this Agreement, if any, against any payment therefor.

L.    Franchisee shall comply with the covenants contained in Paragraph XV of this Agreement.

## XVIII.    TRANSFERABILITY OF INTEREST

A.    This Agreement and all rights hereunder can be assigned and transferred by Franchisor and, if so, shall be binding upon and inure to the benefit of Franchisor's successors and assigns; provided, however, that with respect to any assignment resulting in the subsequent performance by the assignee of the functions of Franchisor, the assignee shall:

1.    At the time of such assignment, be financially responsible and economically capable, in Franchisor's reasonable judgment, of performing the obligations of Franchisor hereunder; and

2.    Expressly assume and agree to perform such obligations. Specifically, and without limitation to the foregoing, Franchisee expressly agrees that Franchisor may sell its assets, Marks or System outright to a third party; may make a public offering of securities; may engage in a private placement of some or all of its securities; may merge, acquire other corporations or entities, or be acquired by another corporation or other entity; may undertake a refinancing, recapitalization, leveraged buy out or other economic or financial restructuring; and, with regard to any or all of the above sales, assignments and dispositions, Franchisee expressly and specifically waives any claims, demands or damages arising from or related to the loss of said Marks (or any variation thereof) and/or the loss of association with or identification of JIMMY JOHN'S FRANCHISE, INC. as Franchisor hereunder. Nothing contained in this Agreement shall require Franchisor to remain in the business in the event that Franchisor exercises its rights hereunder to assign its rights in this Agreement.

B.    This Agreement and all rights hereunder may be assigned and transferred by Franchisee and, if so, shall be binding upon and inure to the benefit of Franchisee's successors and assigns, subject to the following conditions and requirements and Franchisor's right of first refusal as set forth herein:

1.    No Franchisee, partner of Franchisee (if Franchisee is a partnership), or owner of Franchisee (if Franchisee is a corporation or limited liability company), without Franchisor's prior written consent, by operation of law or otherwise, shall sell, assign, transfer, convey, give away, or encumber to any person, firm, or corporation all or any part of its interest in this Agreement, or its interest in the franchise granted hereby and this Agreement, or its interest in any proprietorship, partnership, corporation, or limited liability company which owns any interest in the franchise, nor offer, permit, or suffer the same to be sold, assigned, transferred, conveyed, given away, or encumbered in any way to any person, firm, or corporation. Franchisee may not, without the prior written consent of Franchisor, fractionalize any of the rights of Franchisee granted pursuant to this Agreement. Any purported assignment of any of Franchisee's rights herein not having the aforesaid consent shall be null and void and shall constitute a material default hereunder.

2.    Franchisor shall not unreasonably withhold its consent to any transfer referenced in Paragraph XVIII.B.1 of this Agreement when requested; provided, however, that the following conditions and requirements shall first be met to the full satisfaction of Franchisor:

(a)    If Franchisee is an individual or partnership and desires to assign and transfer its rights to a corporation or limited liability company:

(1)    Said transferee corporation or limited liability company shall be newly organized and its charter shall provide that its activities are confined exclusively to acting as a JIMMY

JOHN'S Franchised Restaurant as licensed under this Agreement;

(2) Franchisee shall be and shall remain the owner of the majority fifty-one percent (51%) stock or membership interest of the transferee corporation or limited liability company;

(3) The individual Franchisee (or, if Franchisee is a partnership, one (1) of the partners) shall be and shall remain the principal executive officer of the corporation or limited liability company;

(4) The transferee corporation or limited liability company shall enter into a written assignment (in a form satisfactory to Franchisor), in which the transferee corporation or limited liability company assumes all of Franchisee's obligations hereunder;

(5) All shareholders or members of the transferee corporation or limited liability company shall enter into a written Agreement, in a form satisfactory to Franchisor, jointly and severally guaranteeing the full payment and performance of the transferee corporation's or limited liability company's obligations under this Agreement;

(6) Each stock certificate or other evidence of ownership of the transferee corporation or limited liability company shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon assignments by this Agreement;

(7) No new shares of common or preferred voting stock in the transferee corporation or membership interests in the limited liability company shall be issued to any person, partnership, trust, foundation, or corporation without obtaining Franchisor's prior written consent and then only upon disclosure of the terms and conditions contained herein being made to the prospective new holders of the stock or membership interests;

(8) All accrued money obligations of Franchisee to Franchisor, its subsidiaries or assignees shall be satisfied prior to assignment or transfer.

(b)    If the transfer, other than such transfer as is authorized under Paragraph XVIII.B.2(a) of this Agreement, if consummated alone or together with other previous, simultaneous, or proposed transfers, would have the effect of transferring control of the franchise licensed herein to someone other than an original signatory of this Agreement:

(1)    The transferee(s) shall be of good moral character and reputation and shall have a good credit rating and competent business qualifications reasonably acceptable to Franchisor. Franchisee shall provide Franchisor with such information as Franchisor may require to make such determination concerning each such proposed transferee(s).

(2)    The transferee(s) or such other individual(s) as shall be the actual manager of the franchise shall have successfully completed and passed the training course then in effect for franchisees (which may be Franchisor's standard three (3) week training course or, if the conditions of Paragraph IV.A. are satisfied, Franchisor's abbreviated or refresher five (5) day training program) or otherwise demonstrated to Franchisor's satisfaction sufficient ability to operate the business being transferred.

(3)    The transferee(s), including all shareholders, owners, officers, directors and partners of the transferee(s), shall jointly and severally execute any or all of the following as Franchisor shall direct:

(a)    A Franchise Agreement and other standard ancillary agreements with Franchisor on the current standard forms being used by Franchisor, except that an additional franchise fee shall not be charged; and/or

(b)    A written assignment from Franchisee in a form satisfactory to Franchisor, wherein transferee shall assume all of Franchisee's obligations hereunder.

(4)    Approval by Franchisor of any transfer by Franchisee of the franchise herein granted or any of Franchisee's rights under this Agreement shall in no way be deemed a release by Franchisor of Franchisee's obligations pursuant to this Agreement. Consent by Franchisor to a transfer of the franchise shall not constitute or be interpreted as consent for any future transfer thereof.

(5)     The term of said agreements required pursuant to Subparagraph XVIII.B.2(b)(3) shall be for the unexpired term of this Agreement and for any extensions or renewals as provided herein.

(6)     If transferee is a corporation or limited liability company:

    (a)     Each stock certificate or other evidence of ownership of the transferee corporation or limited liability company shall have conspicuously endorsed upon it a statement that it is held subject to, and that further assignment or transfer thereof is subject to, all restrictions imposed upon assignments by this Agreement; and

    (b)     No new shares of common or preferred voting stock in the transferee corporation or membership interests in the limited liability company shall be issued to any person, partnership, trust, foundation, or corporation without obtaining Franchisor's prior written consent and then only upon disclosure of the terms and conditions contained herein being made to the prospective new holders of the stock; and

    (c)     All shareholders of the transferee corporation or members of the limited liability company shall enter into a written Agreement, in a form satisfactory to Franchisor, jointly and severally guaranteeing full payment and the performance of the transferee corporation of all obligations under this Agreement.

(7)     All accrued money obligations of Franchisee to Franchisor or its assignees shall be satisfied prior to assignment or transfer, and Franchisee shall not be in default under the terms of this Agreement.

(8)     Franchisee, prior to the transfer, shall execute a general release, in a form prescribed by Franchisor, of any and all existing claims against Franchisor, and its respective owners, officers, directors, agents and employees, except such claims as are not permitted to be waived under applicable law.

3.    Franchisee shall have fully paid and satisfied all of Franchisee's obligations to Franchisor, and the transferee or Franchisee shall have fully paid to Franchisor a non-refundable transfer fee at the time of the transfer.

(a)    A transferee of this Agreement and the Franchised Restaurant shall pay a transfer fee equal to fifty percent (50%) of the then-current initial franchise fee.

(b)    If up to forty-nine percent (49%) of the outstanding ownership interest in Franchisee is changed or transferred, the transferee or Franchisee shall pay a transfer fee of SEVEN THOUSAND FIVE HUNDRED DOLLARS ($7,500.00) per individual, partner, shareholder or other owner; provided, however, that the original owners, alone or collectively, of fifty-one percent (51%) or more of the ownership interest in the Franchisee entity immediately prior to the transfer remain the owner(s) of fifty-one percent (51%) or more of the ownership interest in the Franchisee entity at the time of and following the transfer.

(c)    If any change in ownership interests in Franchisee results in the change of the original person(s) or entity(ies) who alone or collectively own fifty-one percent (51%) or more of the ownership interest in the Franchisee entity, the Franchisee or transferee shall pay a transfer fee equal to fifty percent (50%) of the then-current initial franchise fee.

(d)    If a husband and wife hold equal ownership in the Franchisee entity and one spouse transfers his or her ownership interest in Franchisee due to dissolution of the marriage or the death of one (1) of the spouses, Franchisee shall pay a transfer fee of SEVEN THOUSAND FIVE HUNDRED DOLLARS ($7,500.00).

The transfer fee is used to cover expenses of Franchisor for the training, supervision, administrative costs, overhead, counsel fees, accounting and other Franchisor expenses in connection with the transfer. Franchisor shall approve a transfer of ownership interest, subject to Paragraphs XVIII.B.3(b) and (c), if Franchisee meets certain criteria, including, without limitation, that the transferee has satisfactorily completed the initial training program required in Paragraph IV.A. of this Agreement and has held an ownership interest of twenty-five percent (25%) or more of the ownership interest in Franchisee for a minimum of twelve (12) continuous months prior to the date of the transfer. This transfer fee does not apply to an assignment of interest to a corporation under Paragraph XVIII.B.2(a) of this Agreement.

4.    No sale, assignment, transfer, conveyance, encumbrance, or gift of any interest in this Agreement or in the franchise granted thereby shall relieve Franchisee and the owners or partners participating in any transfer of the obligations of the covenants contained in Paragraph XV, except where Franchisor shall expressly authorize in writing.

C.    Franchisee must promptly ("promptly" herein defined as within thirty (30) days of receipt of an offer to buy) give Franchisor written notice whenever Franchisee has received an offer to buy Franchisee's franchise. Franchisee must also give Franchisor written notice simultaneously with any offer to sell the franchise made by, for, or on behalf of Franchisee. The purpose of this Paragraph is to enable Franchisor to comply with any applicable state or federal franchise disclosure laws or rules and, as applicable, to determine whether to exercise its right of first refusal. Franchisee shall indemnify and hold harmless Franchisor for Franchisee's failure to comply with this Paragraph.

D.    Franchisee shall not, without prior written consent of Franchisor, place in, on or upon the location of the Franchised Restaurant, or in any communication media, any form of advertising, or list with any business, real estate broker, agent, or attorney, any information relating to the sale of the Franchised Restaurant or the rights granted hereunder.

## XIX.    DEATH OR INCAPACITY OF FRANCHISEE

A.    In the event of the death or incapacity of an individual Franchisee, or any partner of a Franchisee which is a partnership or any owner owning fifty percent (50%) or more of the capital stock of a Franchisee which is a corporation or membership interests of a Franchisee which is a limited liability company, the heirs, beneficiaries, devisees, or legal representatives of said individual, partner or owners shall, within one hundred eighty (180) days of such event:

1.    Apply to Franchisor for the right to continue to operate the franchise for the duration of the term of this Agreement and any renewals hereof, which right shall be granted upon the fulfillment of all of the conditions set forth in Paragraph XVIII.B.2(b) of this Agreement (except that no transfer fee shall be required); or

2.    Sell, assign, transfer, or convey Franchisee's interest in compliance with the provisions of Paragraphs XVIII.B. and XX of this Agreement; provided, however, in the event a proper and timely application for the right to continue to operate has been made and rejected, the one hundred eighty (180) days to sell, assign, transfer or convey shall be computed from the date of said rejection. For purposes of this Paragraph, Franchisor's silence on an application made pursuant to Paragraph XIX.A.1 through the one hundred and eighty (180) days following the event of death or incapacity shall be deemed a rejection made on the last day of such period.

B.    In the event of the death or incapacity of an individual franchisee, or any partner or owner of a Franchisee which is a partnership, corporation, or limited liability company, where the aforesaid provisions of Paragraph XVIII have not been fulfilled within the time provided, all rights granted to Franchisee under this Agreement shall, at the option of Franchisor, terminate forthwith, and Franchisor shall have the option to purchase the Franchised Restaurant in accordance with Paragraph XVII.K. herein.

## XX.    RIGHT OF FIRST REFUSAL

If Franchisee or its owners propose to sell the Franchised Restaurant (or its assets) or part or all of the ownership of Franchisee in a transaction that otherwise would be allowed under Paragraph XVIII.B., Franchisee or its owners shall obtain from a responsible and fully disclosed buyer, and send to Franchisor, a true and complete copy of a bona fide, executed written offer relating exclusively to an interest in Franchisee or in this Agreement and the Franchised Restaurant. To be a valid, bona fide offer, the offer must include details of the payment terms of the proposed sale and the sources and terms of any financing for the proposed purchase price; the proposed purchase price must be in a dollar amount; and the proposed buyer must submit with its offer an earnest money deposit equal to five percent (5%) or more of the offering price. The right of first refusal process will not be triggered unless and until the proposed offer is deemed to be bona fide by virtue of its satisfying these conditions and being received by Franchisor.

For a period of fifteen (15) business days from the date of delivery to Franchisor of such a bona fide offer and all other information that Franchisor reasonably requests, Franchisor shall have the right, exercisable by written notice to Franchisee or its owners, to notify Franchisee or its selling owner(s) that it desires to purchase the Franchised Restaurant (or its assets) or the ownership interest in Franchisee for the price and on the terms and conditions contained in the bona fide offer, provided that Franchisor may substitute cash for any form of payment proposed in such offer, Franchisor's credit will be deemed equal to the credit of any proposed buyer, Franchisor will have not less than forty-five (45) days to prepare for closing after notifying Franchisee of its election to purchase, and Franchisor must receive, and Franchisee and its owners agree to make, all customary representations and warranties given by the seller of the assets of a business or the ownership interests in a legal entity, as applicable, including, without limitation, representations and warranties regarding ownership and condition of and title to ownership interests and/or assets; liens and encumbrances relating to ownership interests and/or assets; and validity of contracts and the liabilities, contingent or otherwise, of the entity whose ownership interests are being purchased.

If Franchisor exercises its right of first refusal, Franchisee and its selling owner(s) agree that, for two (2) years beginning on the closing date, they will not engage in any of the activities prohibited by Paragraph XV.D. Franchisor has the unrestricted right to assign this right of first refusal to a third party.

If Franchisor does not exercise its right of first refusal, Franchisee or its owners may complete the sale to the proposed buyer on the original offer's terms, but subject to Franchisor's approval of the transfer as provided in Paragraph XVIII.B. above. This means that, even if Franchisor does not exercise its right of first refusal (whether or not it is properly triggered as provided above), if the proposed transfer otherwise would not be allowed under Paragraph XVIII.B. above, Franchisee and its owners may not move forward with the transfer at all.

If Franchisee (or its owners) do not complete the sale to the proposed buyer within sixty (60) days after Franchisor provides notice that it does not intend to exercise its right of first

refusal, or if there is a material change in the terms of the sale (which Franchisee must tell Franchisor promptly), Franchisor will have an additional right of first refusal during the thirty (30) day period following either the expiration of the sixty (60) day period or Franchisor's receipt of notice of the material change(s) in the sale's terms, either on the terms originally offered or the modified terms, at Franchisor's option.

## XXI.    OPERATION IN THE EVENT OF ABSENCE, DISABILITY OR DEATH

In order to prevent any interruption of the Franchised Restaurant which would cause harm to the Franchised Restaurant and thereby depreciate the value thereof, Franchisee authorizes Franchisor, in the event that Franchisee is absent or incapacitated by reason of illness or death and is not, therefore, in the sole judgment of Franchisor, able to operate the Franchised Restaurant, to operate the Franchised Restaurant for so long as Franchisor deems necessary and practical and without waiver of any other rights or remedies Franchisor may have under this Agreement. Provided, however, that Franchisor shall not be obligated to so operate the franchise. All monies from the operation of the business during such period of operation by Franchisor shall be kept in a separate account and the expenses of the Franchised Restaurant, including reasonable compensation and expenses for Franchisor's representative, shall be charged to said account. If, as herein provided, Franchisor temporarily operates for Franchisee the Franchised Restaurant, Franchisee shall indemnify and hold harmless Franchisor and any representative of Franchisor who may act hereunder from any and all claims arising from the operation of the Franchised Restaurant, including, without limitation, the acts and omissions of Franchisor and its representative.

## XXII.    INDEPENDENT CONTRACTOR AND INDEMNIFICATION

A.    This Agreement does not constitute Franchisee as an agent, legal representative, joint venturer, partner, employee, or servant of Franchisor for any purpose whatsoever. Franchisee may not represent to third parties that it is an agent of Franchisor, and it is understood between the parties hereto that Franchisee shall be an independent contractor and is in no way authorized to make any contract, agreement, warranty or representation on behalf of Franchisor or to create any obligation, express or implied, on behalf of Franchisor.

B.    Franchisee shall prominently display, by posting of a sign within public view, on or in the Premises of the Franchised Restaurant a statement that clearly indicates that the Franchised Restaurant is independently owned and operated by Franchisee as a JIMMY JOHN'S Franchised Restaurant of Franchisor and not as an agent thereof.

C.    Franchisee shall defend at its own cost and indemnify and hold harmless Franchisor, its shareholders, directors, officers, employees and agents, from and against any and all loss, costs, expenses (including attorneys' fees), damages and liabilities, however caused, resulting directly or indirectly from or pertaining to the use, condition, or construction, equipping, decorating, maintenance or operation of the Franchised Restaurant, including the sale of any food products, service or merchandise sold from the Franchised Restaurant. Such loss,

claims, costs, expenses, damages and liabilities shall include, without limitation, those arising from latent or other defects in the Franchised Restaurant, whether or not discoverable by Franchisor, and those arising from the death of or injury to any person or arising from damage to the property of Franchisee or Franchisor, their agents or employees, or any third person, firm or corporation, whether or not such losses, claims, costs, expenses, damages, or liabilities were actually or allegedly caused wholly or in part through the active or passive negligence of Franchisor or any of its agents or employees or resulted from any strict liability imposed on Franchisor or any of its agents or employees.

## XXIII.    NON-WAIVER

No failure of Franchisor to exercise any power reserved to it hereunder, or to insist upon strict compliance by Franchisee with any obligation or condition hereunder, and no custom or practice of the parties in variance with the terms hereof, shall constitute a waiver of Franchisor's right to demand exact compliance with the terms hereof. Waiver by Franchisor of any particular default by Franchisee shall not be binding unless in writing and executed by the party sought to be charged and shall not affect or impair Franchisor's right with respect to any subsequent default of the same or of a different nature; nor shall any delay, waiver, forbearance, or omission of Franchisor to exercise any power or rights arising out of any breach or default by Franchisee of any of the terms, provisions, or covenants hereof affect or impair Franchisor's rights; nor shall such constitute a waiver by Franchisor of any right hereunder or of the right to declare any subsequent breach or default; nor shall Franchisor's action or inaction with respect to other JIMMY JOHN'S Franchised Restaurants, nor the existence of franchise agreements for other JIMMY JOHN'S Franchised Restaurants which contain provisions different from those contained in this Agreement, constitute a waiver by Franchisor of any of its rights. Subsequent acceptance by Franchisor of any payment(s) due to it hereunder shall not be deemed to be a waiver by Franchisor of any preceding breach by Franchisee of any terms, covenants or conditions of this Agreement.

## XXIV.    NOTICES

Any and all notices required or permitted under this Agreement shall be in writing and shall be personally delivered, delivered by messenger or delivery services, mailed by certified mail return receipt requested, or sent by facsimile transmission, and shall be effective when received or confirmation of receipt is acknowledged to the respective parties at the following addresses unless and until a different address has been designated by written notice to the other party:

Notices to Franchisor:

JIMMY JOHN'S FRANCHISE, INC..
600 Tollgate Road
Elgin, Illinois 60123
Facsimile No.: (847) 888-7070

41

Courtesy Copy to:

_____

_____

Facsimile No.: _____

Notices to Franchisee:

Tamer Mercho
9901 North 700 West
McCordsville, IN 46055

Telephone No.: _____

Courtesy Copy to:

_____

_____

Facsimile No.: _____

Any notice by certified mail shall be deemed to have been given at the date and time of mailing.

## XXV.  COST OF ENFORCEMENT OR DEFENSE

In the event that Franchisor is required to employ legal counsel or to incur other expenses to enforce any obligation of Franchisee hereunder, or to defend against any claim, demand, action, or proceeding by reason of Franchisee's failure to perform any obligation imposed upon Franchisee by this Agreement, and provided that legal action is filed and such action or the settlement thereof establishes Franchisee's default hereunder, then Franchisor shall be entitled to recover from Franchisee the amount of all reasonable attorneys' fees of such counsel and all other expenses incurred in enforcing such obligation or in defending against such claim, demand, action, or proceeding, whether incurred prior to, or in preparation for, or in contemplation of the filing of such action or thereafter.

## XXVI.  APPROVALS

A.   Whenever this Agreement requires the prior approval or consent of Franchisor, Franchisee shall make a timely written request to Franchisor therefor, and, except as otherwise provided herein, any approval or consent granted shall be effective only if in writing.

B.   Franchisor makes no warranties or guarantees upon which Franchisee may rely and assumes no liability or obligation to Franchisee or any third party to which it would not otherwise be subject by providing any waiver, approval, advice, consent or services to Franchisee in connection with this Agreement or by reason of any neglect, delay or denial of any request therefor.

## XXVII.  ENTIRE AGREEMENT

This Agreement, any exhibit attached hereto, and the documents referred to herein shall be construed together and constitute the entire, full and complete Agreement between Franchisor

and Franchisee concerning the subject matter hereof and supersede all prior agreements, representations, and understandings. No other representation has induced Franchisee to execute this Agreement, and there are no representations, inducements, promises, or agreements, oral or otherwise, between the parties not embodied herein which are of any force or effect with reference to this Agreement or otherwise. No amendment, change or variance from this Agreement shall be binding on either party unless executed in writing by both parties.

## XXVIII. SEVERABILITY AND CONSTRUCTION

A.    Each paragraph, part, term and/or provision of this Agreement shall be considered severable, and if, for any reason, any paragraph, part, term and/or provision herein is determined to be invalid and contrary to, or in conflict with, any existing or future law or regulation, such shall not impair the operation of or affect the remaining portions, sections, parts, terms and/or provisions of this Agreement, and the latter will continue to be given full force and effect and bind the parties hereto; and said invalid sections, parts, terms and/or provisions shall be deemed not part of this Agreement.

B.    Anything to the contrary herein notwithstanding, nothing in this Agreement is intended, nor shall be deemed, to confer upon any person or legal entity other than Franchisor or Franchisee and such of their respective successors and assigns as may be contemplated by this Agreement any rights or remedies under or by reason of this Agreement.

C.    Franchisee shall be bound by any promise or covenant imposing the maximum duty permitted by law which is contained within the terms of any provision hereof, as though it were separately stated in and made a part of this Agreement, that may result from striking from any of the provisions hereof any portion or portions which a court may hold to be unreasonable and unenforceable in a final decision to which Franchisor is a party or from reducing the scope of any promise or covenant to the extent required to comply with such a court order.

D.    All captions herein are intended solely for the convenience of the parties, and none shall be deemed to affect the meaning or construction of any provision hereof. The singular usage includes the plural, where appropriate in the context, and the masculine and neuter usages include the other and the feminine.

E.    This Agreement may be executed in duplicate, and each copy so executed shall be deemed an original.

F.    The recitals set forth in this Agreement are specifically incorporated into the terms of this Agreement and hereby constitute a part thereof.

## XXIX. APPLICABLE LAW

A.    THIS AGREEMENT AND THE RIGHTS OF THE PARTIES HEREUNDER TAKE EFFECT UPON ACCEPTANCE AND EXECUTION BY FRANCHISOR AND SHALL BE INTERPRETED AND CONSTRUED UNDER THE LAWS OF ILLINOIS, WHICH LAWS

SHALL PREVAIL IN THE EVENT OF ANY CONFLICT OF LAWS, EXCEPT TO THE EXTENT GOVERNED BY THE UNITED STATES TRADEMARK ACT OF 1946 (LANHAM ACT, 15 U.S.C. SECTIONS 1051 ET SEQ.) AND THE FEDERAL ARBITRATION ACT. PROVIDED, HOWEVER, THAT THE ILLINOIS FRANCHISE DISCLOSURE ACT AND ANY OTHER ILLINOIS LAW REGULATING THE OFFER AND SALE OF FRANCHISES OR GOVERNING THE RELATIONSHIP BETWEEN A FRANCHISOR AND FRANCHISEE WILL NOT APPLY UNLESS ITS JURISDICTIONAL REQUIREMENTS ARE SATISFIED INDEPENDENTLY WITHOUT REFERENCE TO THIS PARAGRAPH.

B.   FRANCHISEE ACKNOWLEDGES THAT THIS AGREEMENT IS ENTERED INTO IN CHAMPAIGN COUNTY, ILLINOIS, AND THAT ANY ACTION SOUGHT TO BE BROUGHT BY EITHER PARTY, EXCEPT THOSE CLAIMS REQUIRED TO BE SUBMITTED TO ARBITRATION, SHALL BE BROUGHT IN THE APPROPRIATE STATE OR FEDERAL COURT WITH JURISDICTION OVER CHAMPAIGN COUNTY, ILLINOIS. THE PARTIES DO HEREBY WAIVE ALL QUESTIONS OF PERSONAL JURISDICTION OR VENUE FOR THE PURPOSES OF CARRYING OUT THIS PROVISION.

C.   NO RIGHT OR REMEDY CONFERRED UPON OR RESERVED TO FRANCHISOR OR FRANCHISEE BY THIS AGREEMENT IS INTENDED TO BE, NOR SHALL BE DEEMED, EXCLUSIVE OF ANY OTHER RIGHT OR REMEDY HEREIN OR BY LAW OR EQUITY PROVIDED OR PERMITTED, BUT EACH SHALL BE CUMULATIVE OF EVERY OTHER RIGHT OR REMEDY.

D.   NOTHING HEREIN CONTAINED SHALL BAR FRANCHISOR'S RIGHT TO OBTAIN INJUNCTIVE RELIEF AGAINST THREATENED CONDUCT THAT WILL CAUSE IT LOSS OR DAMAGES, UNDER THE USUAL EQUITY RULES, INCLUDING THE APPLICABLE RULES FOR OBTAINING RESTRAINING ORDERS AND PRELIMINARY INJUNCTIONS.

## XXX.   ARBITRATION

A.   Any monetary claim arising out of or relating to this Agreement or any breach thereof and any controversy regarding the establishment of the fair market value of leasehold improvements and other Franchised Restaurant assets pursuant to Paragraph XVII.K. hereof (but excluding any claims regarding confidential information, the non-compete clauses in Paragraph XV or the Marks), and any controversies, disputes or claims arising between Franchisor and Franchisee in connection with, arising from, or with respect to: (1) any provision of this Agreement or any other agreement related to this Agreement between the parties; (2) the relationship of the parties hereto; (3) the validity of this Agreement or any other agreement related to this Agreement between the parties or any provisions thereof; or (4) any specification, standard or operating procedure relating to the establishment or operation of the Franchised Restaurant which shall not be resolved within fifteen (15) days after either party shall notify the other in writing of such controversy, dispute or claim shall be submitted to arbitration in Champaign County, Illinois, in accordance with the rules of the American Arbitration Association, and judgment upon the award may be entered in any court having jurisdiction

thereof. Nothing contained herein shall, however, be construed to limit or to preclude Franchisor from bringing any action in any court of competent jurisdiction for injunctive or other provisional relief as Franchisor deems to be necessary or appropriate to compel Franchisee to comply with his obligations hereunder or to protect the Marks or other property rights of Franchisor. In addition, nothing contained herein shall be construed to limit or to preclude Franchisor from joining with any action for injunctive or provisional relief all monetary claims that Franchisor may have against Franchisee which arise out of the acts or omissions to act giving rise to the action for injunctive or provisional relief. This arbitration provision shall be deemed to be self-executing and, in the event that Franchisee fails to appear at any properly noticed arbitration proceeding, award may be entered against Franchisee notwithstanding its failure to appear.

B.    Nothing herein contained shall bar the right of either party to seek and obtain temporary injunctive relief from a court of competent jurisdiction in accordance with applicable law against threatened conduct that will cause loss or damage, pending completion of the arbitration.

C.    It is the intent of the parties that any arbitration between Franchisor and Franchisee shall be of Franchisee's individual claim and that the claim subject to arbitration shall not be arbitrated on a classwide basis.

D.    Franchisee hereby consents and agrees that any disputes arising between Franchisor and Franchisee be submitted to arbitration as provided in Paragraph XXX.A. of this Agreement.

## XXXI.    FORCE MAJEURE

Whenever a period of time is provided in this Agreement for either party to do or perform any act or thing, except the payment of monies, neither party shall be liable or responsible for any delays due to strikes, lockouts, casualties, acts of God, war, governmental regulation or control or other causes beyond the reasonable control of the parties, and in any event said time period for the performance of an obligation hereunder shall be extended for the amount of time of the delay. This clause shall not apply or not result in an extension of the term of this Agreement.

## XXXII.   "FRANCHISEE" DEFINED AND GUARANTY

As used in this Agreement, the term "Franchisee" shall include all persons who succeed to the interest of the original Franchisee by permitted transfer or operation of law and shall be deemed to include not only the individual or entity defined as "Franchisee" in the introductory paragraph of this Agreement, but shall also include all partners of the entity that executes this Agreement, in the event said entity is a partnership, and all owners, officers and directors of the entity that executes this Agreement, in the event said entity is a corporation or limited liability company. By their signatures hereto, all partners, owners, officers and directors of the entity that signs this Agreement as Franchisee acknowledge and accept the duties and obligations imposed

upon each of them, individually, by the terms of this Agreement. All partners of the entity that executes this Agreement, in the event said entity is a partnership, and all owners, officers and directors of the entity that executes this Agreement, in the event said entity is a corporation or limited liability company, shall execute the Guaranty and Assumption of Obligations attached hereto as Exhibit A and made a part hereof.

## XXXIII. CAVEAT

The success of the business venture contemplated to be undertaken by Franchisee by virtue of this Agreement is speculative and depends, to a large extent, upon the ability of Franchisee as an independent businessperson and its active participation in the daily affairs of the business as well as other factors. Franchisor does not make any representation or warranty, express or implied, as to the potential success of the business venture contemplated hereby.

## XXXIV. ACKNOWLEDGMENTS

A.    Franchisee represents and acknowledges that it has received, read and understood this Agreement and Franchisor's Uniform Franchise Offering Circular; and that Franchisor has fully and adequately explained the provisions of each to Franchisee's satisfaction; and that Franchisor has accorded Franchisee ample time and opportunity to consult with advisors of its own choosing about the potential benefits and risks of entering into this Agreement.

B.    Franchisee acknowledges that it has received a copy of this Agreement and the attachments thereto at least five (5) business days prior to the date on which this Agreement was executed. Franchisee further acknowledges that Franchisee has received Franchisor's Uniform Franchise Offering Circular at least ten (10) business days prior to the date on which this Agreement was executed.

C.    Franchisee has been advised to consult with its own advisors with respect to the legal, financial and other aspects of this Agreement, the business franchised hereby, and the prospects for that business. Franchisee has either consulted with such advisors or has deliberately declined to do so.

D.    The covenants not to compete set forth in this Agreement are fair and reasonable and will not impose any undue hardship on Franchisee since Franchisee has other considerable skills, experience and education which afford Franchisee the opportunity to derive income from other endeavors.

E.    Franchisee affirms that all information set forth in any and all applications, financial statements and submissions to Franchisor is true, complete and accurate in all respects, with Franchisee expressly acknowledging that Franchisor is relying upon the truthfulness, completeness and accuracy of such information.

F.    Franchisee has conducted an independent investigation of the business contemplated by this Agreement and recognizes that, like any other business, an investment in a

JIMMY JOHN'S Franchised Restaurant involves business risks and that the success of the venture is primarily dependent upon the business abilities and efforts of Franchisee.

G.    Franchisee hereby consents and agrees that any disputes arising between Franchisor and Franchisee be submitted to arbitration as provided in Paragraph XXX.A. of this Agreement.

H.    FRANCHISEE UNDERSTANDS AND ACKNOWLEDGES THAT ALL REPRESENTATIONS OF FACT CONTAINED HEREIN ARE MADE SOLELY BY FRANCHISOR. ALL DOCUMENTS, INCLUDING FRANCHISOR'S FRANCHISE AGREEMENT AND UNIFORM FRANCHISE OFFERING CIRCULAR AND ALL EXHIBITS THERETO, HAVE BEEN PREPARED SOLELY IN RELIANCE UPON REPRESENTATIONS MADE AND INFORMATION PROVIDED BY FRANCHISOR, ITS OFFICERS AND ITS DIRECTORS. FRANCHISEE FURTHER AGREES TO INDEMNIFY AND HOLD HARMLESS THE PREPARER OF ANY AND ALL SUCH FRANCHISE AGREEMENTS, OFFERING CIRCULARS AND EXHIBITS THERETO FROM ANY AND ALL LOSS, COSTS, EXPENSES (INCLUDING ATTORNEYS' FEES), DAMAGES AND LIABILITIES RESULTING FROM ANY REPRESENTATIONS AND/OR CLAIMS MADE BY FRANCHISOR IN SUCH DOCUMENTS.

IN WITNESS WHEREOF, the parties hereto, intending to be legally bound hereby, have duly executed and delivered this Agreement the day and year first above written.

JIMMY JOHN'S FRANCHISE, INC.

By: _____
      Linda Kelley

Title: _____President_____

_____
Franchisee        Tamer Mercho

_____
Franchisee

_____
Franchisee

## EXHIBIT A TO THE FRANCHISE AGREEMENT

## GUARANTY AND ASSUMPTION OF OBLIGATIONS



THIS GUARANTY AND ASSUMPTION OF OBLIGATIONS is given this _22nd_ day of _April_, 200_2_, by _____ ALL SHAREHOLDERS _____

In consideration of, and as an inducement to, the execution of that certain Franchise Agreement of even date herewith (the "Agreement") by JIMMY JOHN'S FRANCHISE, INC. ("Franchisor"), each of the undersigned hereby personally and unconditionally (1) guarantees to Franchisor, and its successors and assigns, for the term of the Agreement and thereafter as provided in the Agreement, that ___ DELI FRESH INC. ___ ("Franchisee") shall punctually pay and perform each and every undertaking, agreement and covenant set forth in the Agreement; and (2) agrees personally to be bound by, and personally liable for the breach of, each and every provision in the Agreement, both monetary obligations and obligations to take or refrain from taking specific actions or to engage or refrain from engaging in specific activities, including, without limitation, the provisions of Paragraph XV and the confidentiality and arbitration obligations. Despite the obligations set forth in subparagraphs (1) and (2) above, the personal liability of the undersigned by virtue of this Guaranty for any of Franchisor's monetary claims arising under the Agreement will not exceed One Hundred Thousand Dollars ($100,000). However, this dollar limitation will not apply to limit in any way Franchisor's (or any other specified indemnified party's) right to recover from the undersigned by virtue of this Guaranty for claims, damages, and liabilities for which Franchisor (or any other specified indemnified party) is entitled to seek indemnification under Section XXII.C. of the Agreement. Each of the undersigned waives: (1) acceptance and notice of acceptance by Franchisor of the foregoing undertakings; (2) notice of demand for payment of any indebtedness or non-performance of any obligations hereby guaranteed; (3) protest and notice of default to any party with respect to the indebtedness or nonperformance of any obligations hereby guaranteed; (4) any right he may have to require that an action be brought against Franchisee or any other person as a condition of liability; and (5) any and all other notices and legal or equitable defenses to which he may be entitled.

Each of the undersigned consents and agrees that: (1) his direct and immediate liability under this Guaranty shall be joint and several; (2) he shall render any payment or performance required under the Agreement upon demand if Franchisee fails or refuses punctually to do so; (3) such liability shall not be contingent or conditioned upon pursuit by Franchisor of any remedies against Franchisee or any other person; and (4) such liability shall not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence which Franchisor may from time to time grant to Franchisee or to any other person, including, without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims, none of which shall in any way modify or amend this Guaranty, which shall be continuing and irrevocable during the term of the Agreement.

IN WITNESS WHEREOF, each of the undersigned has hereunto affixed his signature on the same day and year as the Agreement was executed.

| GUARANTOR(S) | PERCENTAGE OF OWNERSHIP IN FRANCHISEE |
|---|---|
| Tamer Mercho | 100 % |
| | % |
| | % |
| | % |

## EXHIBIT B TO THE FRANCHISE AGREEMENT

### REFUNDS AND CANCELLATION

Franchisee: _DELi FRESH INC_          Dated: _4/22/2002_

This entire contract is further conditioned upon Franchisor's evaluation of the personal abilities, aptitudes and financial qualifications of Franchisee and Franchisee's manager, if applicable. In accordance therewith, Franchisee and Franchisee's manager, if applicable, shall submit all data requested and Franchisor shall have a reasonable time, not to exceed fifteen (15) business days after submission of all data, to prepare its evaluations. If, for any reason, Franchisor elects to cancel this Agreement after the aforesaid evaluations, it shall notify Franchisee in writing of the cancellation within fifteen (15) days of Franchisor's receipt of the above data. Said notice shall be accompanied by a refund to Franchisee of monies paid to Franchisor under the terms of this Agreement less the amount stated below, and the notice and refund shall cause an automatic cancellation of this Agreement without further notice.

In the event of a cancellation of this Agreement as set forth above, Franchisor shall be entitled to a reasonable fee for its evaluation of Franchisee and related preparatory work performed and expenses actually incurred but not to exceed THREE THOUSAND DOLLARS ($3,000.00). If Franchisee has paid franchise fees in excess of the amount owed to Franchisor for Franchisor's evaluation, Franchisor shall return such excess amount to Franchisee and Franchisor shall be fully and forever released from any claims or causes of action the Franchisee may have under or pursuant to the Franchise Agreement.

JIMMY JOHN'S FRANCHISE, INC.

By: _Linda Kelley_
    Linda Kelley

Title: _President_


_Tamer Mercho_
Franchisee          Tamer Mercho


Franchisee


Franchisee

### DELIVERY AREA RIDER
### TO
### JIMMY JOHN'S FRANCHISE, INC.
### FRANCHISE AGREEMENT

1.   **Background**.  This Delivery Area Rider (the "Rider") is between Jimmy John's Franchise, Inc. ("we," "us," or "our") and _DELI FRESH INC._ ("you" or "your"). This Rider, to be effective as of _4/22/2002_, is attached to, and intended to be a part of, the Franchise Agreement (the "Franchise Agreement") that we and you signed as of _4/22/2002_ for the operation of a Jimmy John's® Restaurant located in Fishers or Nobelsville, Ind. (to be determined) (the "Restaurant"). We and you are signing this Rider because you want us to give you the right to deliver the products made at your Restaurant within a certain geographic area.  We are willing to grant you the right to deliver products made at the Restaurant within a certain geographic area in consideration for, among other things, your willingness to agree to the terms of this Rider.

2.   **Delivery Area**.  Subject to your strict compliance with the Franchise Agreement, we grant you the right to deliver products made at the Restaurant within the following area (the "Area") and only within this Area: _North: Green Belt Ave/University Blvd._
_South: Hwy 410_
_East: Kenilworth_
_West: Adelphi Rd._
You acknowledge and understand that we may, at any time and from time to time, and for any or no reason, change the definition of the Area and, in particular, reduce the size of the Area.  If we ever decide to do so, you agree, without any argument or disagreement, immediately to change the delivery services that you provide and to deliver the Restaurant's products only within the newly-defined Area.  If you fail to do so, we may immediately terminate your right to provide any delivery services anywhere.  You further acknowledge and agree that the Area is not exclusive and that we may engage, and/or allow other franchisees and third parties to engage, in any activities we desire within the Area without any restrictions whatsoever (including allowing other franchisees to provide delivery services in the Area).  The Area is nothing more than geographic boundaries in which you may deliver the Restaurant's products.  It confers no other rights on you whatsoever.

3.   **Term**.  This Rider's term begins on the date we and you sign it and ends on the date when (a) the Franchise Agreement is terminated or expires, or (b) this Rider otherwise is terminated.

4.   **Termination**.  We may terminate this Rider and your right to deliver the Restaurant's products within the Area at any time, effective upon delivery to you of written notice of termination, if you fail to comply with this Rider or to satisfy any of your obligations under the Franchise Agreement, whether or not we send you formal notice of default and whether or not you cure that default.

5.   **Rider to Control**.  Except as provided in this Rider, the Franchise Agreement remains in full force and effect as originally written.  If there is any inconsistency between the

CHGO1:30111317.v1

Franchise Agreement and this Rider, the terms of this Rider will control.

Dated this __22nd__ day of __April__, 2002.


JIMMY JOHN'S FRANCHISE, INC.                    FRANCHISEE:

By: _Linda Kelley_                              By: _James H Mercho_
    Linda Kelley, President                              Tamer Mercho

CHGO1:30111317.v1